A05A1311. ALEXANDER v. THE STATE.

(623 SE2d 160)

SMITH, Presiding Judge.

Andre Alexander was found guilty by a jury of aggravated sodomy, aggravated assault with intent to rape, and burglary. Following the denial of his motion for new trial, Alexander appeals, raising ten enumerations of error. We find no basis for reversal, and we affirm.

The victim, 20 years old at the time of trial, testified that on the morning of October 2, 2002, she wrapped herself in a towel after showering, turned to enter her bedroom, and saw Alexander "standing there with his penis exposed." He placed her on her bed against her will, twice attempted to insert his penis into her vagina, and licked her vagina. During this time, the victim asked Alexander "who he was and why . . . he was doing it." Although Alexander "looked familiar" to the victim, she "didn't know who he was." The victim managed to escape Alexander's grasp and found her telephone, but Alexander chased her and took the telephone away after a brief struggle. He then left the residence. A sheriff's deputy testified that it took him six minutes and forty-six seconds to walk between the victim's residence and Alexander's residence. During his walk, he found the victim's telephone.

1. Alexander argues that the trial court erroneously admitted evidence of similar transactions. The trial court conducted a hearing

required by Uniform Superior Court Rule 31.3 and instructed the jury on the purposes for which it could consider the evidence. The State then presented the testimony of witnesses who were related to Alexander. The 16-year-old victim of the first transaction testified that on April 29, 2002, she awakened to find a man's hand pushing down on her mouth. She managed to scream, but she could not see the man's face because it was dark. Her mother testified that she was awakened by the victim's screams. She ran into her kitchen to find her male friend "tussling" with another man, who escaped by jumping out a window.

The male friend, who also testified at trial, recognized the intruder, left the house in order to determine the intruder's name, and on so doing provided Alexander's name to the police. The police immediately located Alexander and brought him to the victim's home, where the male friend identified him as the intruder. He likewise identified Alexander at trial as the man he chased from the residence. The residence where this incident occurred was located less than half a mile from Alexander's residence.

The State also presented evidence of an incident that occurred on the night of September 2, 2001. After hearing an unusual noise, the victim of this transaction left her bedroom, turned on a light, and saw Alexander standing in the next room. She stated that she had "been knowing him all my life" and that Alexander's father lived "right below" her. He asked whether she had heard him knocking on the door, and he asked to use her telephone because he had locked himself out of his father's house. According to this witness, she had not heard anyone knocking on the door, and if someone had knocked, she would have heard it. She allowed him to use the telephone, and when he began to leave her residence, he "started out but he couldn't find his way out. . . . He said [to the witness] 'I locked myself in . . . I don't know how I did that.' " The witness unlocked the door and let him out. The next day, she observed an open window with a chair beside it, and she realized at that time that Alexander "hadn't come in the door." This also explained "the reason he couldn't find his way back out."

Absent abuse of discretion, we will not disturb a trial court's conclusion concerning the admissibility of similar transaction evidence. *Standfill v. State*, 267 Ga. App. 612, 614 (1) (600 SE2d 695) (2004). Before evidence of an independent event can be admitted, the State must show that the evidence is admissible for a relevant purpose, that the accused is the perpetrator of the independent act, and that a sufficient connection exists between the independent act and the crime charged so that proof of the former event tends to prove the latter. Id.

Alexander contends that these prior incidents were not admissible because they did not involve sexual assaults. But "the issue of

admissibility of extrinsic transactions has never been one of mere similarity. It is, rather, relevance to the issues in the trial of the case." (Citation and punctuation omitted.) *Brockman v. State*, 263 Ga. 637, 640 (3) (436 SE2d 316) (1993). "[T]here is no requirement that the other transaction be identical to the crime charged in every respect. Rather, there can be a substantial variation of circumstances where there exists a logical connection between crimes which are essentially dissimilar." (Citations, punctuation and footnotes omitted.) *Standfill*, supra, 267 Ga. App. at 614 (1).

In addition to being charged with sexual crimes, Alexander was charged in this case with the offense of burglary. Like the incident charged here, both of the prior incidents involved Alexander's unauthorized nighttime entry into the homes of individuals living in close proximity to him. The other transactions involved females acquainted with Alexander, and the victim in this case stated that Alexander "looked familiar." We agree with the State's argument that the prior incidents demonstrated Alexander's "growing boldness" or "escalation" in his criminal activity. A logical connection existed between the prior acts and the offenses at issue in this case. We therefore cannot say that the trial court abused its discretion in admitting the similar transactions.

2. Alexander challenges the constitutionality of OCGA § 16-6-1 (a) (1). But we cannot address Alexander's argument because it was not ruled on below. See *Haynes v. Wells*, 273 Ga. 106, 108 (3) (538 SE2d 430) (2000).

3. Alexander contends that the trial court erred in refusing to recuse.

(a) On the first day of trial, Alexander filed a motion to disqualify the trial judge. He argued among other things that the judge's wife had been a counselor at the victim's high school while the victim had been a student there and that because of this relationship, "the judge's partiality during [the] trial might reasonably be questioned." The judge denied the motion, stating, "[A]lthough my wife was a counselor at a high school, I have no idea who she counseled. She never talks about her job at home, nor I my job. I have no idea who the alleged victim in this case is."

Citing *State v. Fleming*, 245 Ga. 700, 702 (267 SE2d 207) (1980), Alexander correctly notes the general rule that a trial judge considering a recusal motion must "pass on the legal sufficiency of the affidavit, and assuming all the facts alleged to be true, then another judge must be assigned to hear the motion to disqualify." Alexander argues that reversal is required because the trial court decided the motion without first passing on the sufficiency of the affidavit.

Under Canon 3 (E) (1) of the Code of Judicial Conduct, a trial judge must recuse himself or herself whenever his or her impartiality

might reasonably be questioned. The phrase " '[i]mpartiality might reasonably be questioned' means a reasonable perception, of lack of impartiality by the judge, held by a fair minded and impartial person based upon objective fact or reasonable inference. [Cit.]" *Baptiste v. State*, 229 Ga. App. 691, 694 (1) (494 SE2d 530) (1997). In determining the sufficiency of the affidavit, a trial judge must bear in mind that "it is as much the duty of a judge not to grant the motion to recuse when the motion is legally insufficient as it is to recuse when the motion is meritorious; nor does the simple filing of an affidavit automatically disqualify a judge." (Citations and punctuation omitted.) Id. at 695, n. 3. See also *Fleming*, supra, 245 Ga. at 702.

Contrary to Alexander's argument, the trial judge did pass on the legal sufficiency of the affidavit and motion, finding that the fact of his wife's employment was not a valid basis for recusal. Even assuming the truth of the affidavit, it showed only that the judge's wife was a counselor at a school previously attended by the victim and nothing more. This fact does not inescapably lead to the conclusion that a reasonable person would consider the trial judge to have harbored a bias that affected his ability to be impartial. See *Kelly v. State*, 238 Ga. App. 691, 693 (1) (520 SE2d 32) (1999).

(b) Near the end of the seven-day trial, Alexander renewed his motion to disqualify and moved for a mistrial, contending that the judge presiding over the trial was the same judge who signed his arrest warrant. He argued that the judge's impartiality "was open to question due to signing that arrest warrant." He raises as error the denial of his renewed motion. We find no merit in this contention. "The fact that the judge has sat on prior cases of the party or ruled on prior matters in the case before the judge is legally insufficient as a grounds for recusal. [Cits.]" *Baptiste*, supra, 229 Ga. App. at 697 (1). Alexander has made no showing that the trial judge's signature on the arrest warrant "create[d], ipso facto, a situation in which the trial judge's impartiality might reasonably be questioned." *Penney v. State*, 157 Ga. App. 737, 738 (1) (278 SE2d 460) (1981).

4. Alexander contends that the trial court erroneously denied his motion to exclude latent fingerprints presented by the State as evidence. On the first day of trial he moved in limine to exclude "all testimony and documents concerning the latent fingerprints . . . purportedly lifted from the home of the alleged victim" on the ground that the State failed to comply with the reciprocal discovery statute. He argued that the State had denied him "copies of certain latent and ink fingerprints." The prosecutor stated that in preparation for trial, Alexander had been granted "access to the Georgia State Crime Laboratory" and that trial counsel had been allowed to "examine everything he wanted to do. The crime lab does not make photocopies of the prints because they say it does not have enough detail. He was

told that if he wants an expert to look at them, all he has to do is come up there and let us know when he wants to be there." Trial counsel acknowledged that he had gone to the crime lab but stated that he had been denied a copy of a latent palm print, and he expected the prosecutor to offer an expert witness to testify that the latent print matched that of Alexander.

Alexander has shown no basis for reversal. As argued by the State on appeal, Alexander "was invited to have his expert examine the evidence. [He] has made no showing that an examination in this manner would have been insufficient to prepare his defense at trial. That he did not take advantage of the opportunities given him does not now allow him to complain that his rights were violated."

5. Alexander raises several arguments with respect to voir dire.

(a) Alexander contends that the trial court erred in restricting race-related questions during voir dire. Alexander is African-American, and the victim is white. According to the portion of voir dire that was recorded, Alexander sought to ask potential jurors whether they or their children had attended schools where there were "no African-Americans." He also sought to ask if there was "anyone here who if they found themselves in a similar position as [Alexander] would want a jury that does not consist of someone of his or her own race." The trial court would not allow Alexander to ask these questions of the jurors.

The trial court asked counsel, "[W]hy don't you just ask the question of is there any racial biases in the courtroom?" The court further noted that while Alexander could attempt to discern the extent of racial prejudice, voir dire questions could not "go on . . . for ever and ever and ever." The court added, "I don't know where you're going to draw the line. You've talked about . . . the neighborhood. You've talked about who you know. You've talked about the workplace. . . . [W]here are you going to draw the line?" Although the court stated that Alexander could "ask a general race question," Alexander could not question the jurors further about their own schools and those of their children. The court then asked "if there is any possibility that anybody in this courtroom as a prospective juror would be less than impartial because the defendant or the accused is an African-American and the alleged victim is white. If there is any possibility that you can think of that remotely would touch on your impartiality in this case, we need to know." The court received no response from the jurors. We note that defense counsel asked whether "anyone . . . thinks African-Americans are less truthful when compared with white Americans." Again, no one responded.

Alexander contends that the prohibitions placed on voir dire violated OCGA § 15-12-133 and his rights of due process and equal protection under the United States Constitution. Similar arguments

were raised and rejected in *Robles v. State*, 277 Ga. 415 (589 SE2d 566) (2003).[1] In that case, the Georgia Supreme Court reiterated the longstanding law regarding the control of voir dire as follows:

> The single purpose for voir dire is the ascertainment of the impartiality of jurors, their ability to treat the cause on the merits with objectivity and freedom from bias and prior inclination. The control of the pursuit of such determination is within the sound legal discretion of the trial court, and only in the event of manifest abuse will it be upset on review. [Cits.]

Id. at 419 (3). It appears from the limited transcript that, as argued by the State, Alexander "was given wide latitude in asking questions related to race as it related to the jury's neighborhood, who the jury knew and the jury's workplace." And the trial court further specifically asked the jurors whether they harbored any racial bias. Under these circumstances, we cannot conclude that the trial court manifestly abused its discretion in determining that the bias issue "had been sufficiently explored. [Cit.]" Id. See also *Cherry v. State*, 230 Ga. App. 443, 444-445 (1) (496 SE2d 764) (1998).

(b) Alexander contends that he was denied due process and equal protection when the trial court advised the prosecutor to object to his voir dire questions regarding racial bias. The transcript reflects that at some point during voir dire, the trial court asked the prosecutor if he had "an objection to any of this?" It appears from the context of the court's comment, however, that the court was concerned about the nature of the racial questions asked by Alexander. See Division 5 (a). The prosecutor responded to the court's inquiry with an objection on relevance grounds. Alexander argues that by asking the prosecutor if he had an objection, the court exhibited "improper judicial conduct show[ing] that the judge was partial to the State." He contends for at least the third time on appeal that "[t]he trial judge should have disqualified himself and assigned the case to another judge."

We agree with the State's response to this argument, and without further comment, we set it out here:

> In an obvious stretch to create additional enumerations of error, regardless of their merit, appellant argues that the judge acted improperly when he interrupted appellant's counsel's voir dire of the jury. Again, appellant has cited no authority for his contention that the behavior of the judge

---

[1] Alexander's counsel appears to have represented the appellant in *Robles* as well.

was improper. . . . [E]xamination of the jury during voir dire is supervised and directed by the trial court who is given sound discretion to ensure that the questioning is appropriate and not abused. . . . The trial judge did not abuse his discretion when he stopped appellant's counsel from asking repeated and excessive questions regarding race.

(c) Contrary to Alexander's contention, the trial court correctly refused to allow Alexander to question prospective jurors if anyone had reached a conclusion as to his guilt. Such questions are improper. *Cherry*, supra, 230 Ga. App. at 443 (1).

6. Alexander contends that the trial court erroneously denied his motion for mistrial, made on the ground that his character had been impermissibly placed in issue. The matter complained of was an unresponsive remark made by a witness concerning the photographic lineup he had prepared. While explaining the process of preparing the lineup, the witness stated that the photograph had been "taken at the jail." Alexander immediately objected and moved for a mistrial. The trial court denied the motion, and the prosecutor noted that he would "stay away from that" and moved on to other questions.

Alexander's character was not impermissibly placed into issue by virtue of the witness's unresponsive statement. To the extent that the testimony implied that Alexander had been in jail, "mere mention that a defendant has been in jail falls short of placing his character at issue. [Cit.]" *Taylor v. State*, 272 Ga. 559, 561 (2) (c) (532 SE2d 395) (2000). "We review a trial court's denial of a motion for a mistrial based on the injection of improper character evidence for manifest abuse of discretion." (Citation and footnote omitted.) *Smith v. State*, 269 Ga. App. 17, 21 (3) (602 SE2d 921) (2004). We find no such abuse here.

*Judgment affirmed. Ellington and Adams, JJ., concur.*

DECIDED NOVEMBER 8, 2005.

*Michael B. King*, for appellant.
*William T. McBroom, District Attorney, Cindy L. Spindler, Assistant District Attorney*, for appellee.