**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and DILLARD, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 17, 2014**

# In the Court of Appeals of Georgia

A14A1145. BRITTAIN v. THE STATE.

DILLARD, Judge.

Following a trial by jury, Elijah Ames Brittain was convicted of aggravated assault, kidnaping, and burglary. Brittain appeals these convictions, contending that the trial court erred by (1) denying a motion to complete the record, (2) admitting hearsay evidence under the doctrine of forfeiture by wrongdoing, (3) permitting similar-transaction evidence, and (4) denying his motion for new trial when he received ineffective assistance of counsel in numerous regards. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to the jury's guilty verdict,[1] the record reflects that on May 26, 2007, the victim, Chastity Jones, was asleep in her Clayton

---

[1] *See, e.g.*, *Muse v. State*, 323 Ga. App. 779, 780 (748 SE2d 136) (2013).

County house with only her infant daughter at home when she suddenly awoke around 4:00 a.m. to find Brittain in her bedroom. Her husband, Brutus, had left the home earlier in the evening but had not yet returned. Brittain was acquainted with both Jones and Brutus because Brutus was a member of Brittain's restaurant-robbery crew.

Brittain told Jones that Brutus had gotten him into some trouble before forcing Jones to leave her baby, placing her in the trunk of a car, binding her with a phone cord to the point that ligature marks were left on her wrists four days later, and driving her to a secluded location in Cobb County. Evidence later established that Brittain was familiar with this part of Cobb County from previously committing a robbery in the area and because one of his girlfriends worked nearby.

Once they reached this location, Brittain tied Jones to a tree and threatened her life at gunpoint. At some point, Brittain decided to leave but indicated that he would return to kill Jones if he did not hear from Brutus within the next 30 minutes. Nevertheless, in the interim, Jones managed to escape and run to a nearby home,

2

where the occupant allowed her to use his cell phone and drove her to a gas station to call 911.[2]

Using her rescuer's cell phone, Jones called various friends, explaining what had transpired and pleading with them to check on her child. Then, once at the gas station, Jones called 911 from a pay phone, the recording of which was played for the jury without objection, and the parties stipulated that the call occurred at or near the time of the event. Cobb County officers responded to find Jones barefoot, clad in pajamas, covered in mud up to her knees, and carrying only a small personal bag and a phone cord. Upon realizing that Jones had been abducted from Clayton County, both she and investigation of the case were then turned over to authorities from that jurisdiction.

Meanwhile, in response to Jones's frantic calls, friends converged at her house to find her infant child alone and unharmed but lying on the bedroom floor. The home's garage was left wide open and the door unlocked. Indeed, Jones's husband, Brutus, had not been home since before Jones went to bed the previous night, and he was considered missing. But unbeknownst to either Jones or her friends at that time,

---

[2] There are indications in the record that the rescuer, who did not testify, was concerned about becoming overly involved in Jones's plight after she arrived disheveled at his home in the early-morning hours.

just a few hours earlier around 4:45 a.m., Fulton County police responded to a report of a body in the roadway near the border with Clayton County. The body was later identified as that of Brutus Jones, who had been shot in the head. Brutus's cell phone and keys were both missing, and although there were bloody tire tracks near the body, no vehicle was found in the immediate vicinity. Brutus's vehicle, however, was recovered two days later, abandoned not far from the street where his body was found. The passenger-seat headrest was splattered with dried blood, and the garage-door remote was missing.

When law enforcement realized that Jones's husband had been killed, some of her interviews with the various jurisdictions involved in the two investigations were videotaped. And during those interviews, she explained to law enforcement that Brittain had come by the couple's home at approximately 10:35 p.m. the night of the abduction and had rather ominously asked if he could look around the upstairs by suggesting that he was considering whether to rent a similar house. Jones also indicated that Brittain was driving a red Pontiac Grand Am that evening.

In the aftermath of all that transpired, Jones immediately moved out of the Clayton County residence she had shared with Brutus, and in fact moved five times within the next year out of fear. However, in June 2008, Jones—who was

4

accompanied by a good friend—applied for food stamps through Fulton County DFCS, where one of Brittain's paramours, Montessia Tinch, worked as a food-stamp processor. During her relationship with Brittain, Tinch frequently allowed him to use her car, a red Pontiac Grand Prix. And as part of Tinch's job with DFCS, she could access an applicant's home address.[3] Tragically, two days after Jones applied for food stamps, she went missing under circumstances indicative of foul play (more fully described *infra*), and was never heard from again.

Brittain's prosecution for burglary, kidnaping, and aggravated assault related to the May 2007 abduction was stalled after Jones disappeared in 2008, but the case was reinvigorated and brought to trial after a cellmate came forward with information Brittain shared about Jones's abduction, Brutus's murder, and other cases that so greatly disturbed the cellmate that he felt compelled to approach law enforcement. At trial, in addition to corroborating much of Jones's version of the abduction by

---

[3] When Brittain was brought to trial in 2011, an investigating officer testified that Tinch was still employed with DFCS and that law enforcement was still working with DFCS's legal department in an effort to obtain electronic records that would definitively show whether or not Tinch had accessed Jones's address. Nevertheless, the officer also testified that when law enforcement first spoke to Tinch in 2008, she was evasive and in fact attempted to surreptitiously leave the premises before speaking with them after her supervisors summoned her to do so. Tinch did testify, however, that food-stamp applicants must provide a home address.

providing details Brittain had shared, the cellmate also testified that Brittain claimed to have a five-step method to problem-solving, with step two being to "get rid" of the problem, even if that means murder.

Brittain was tried and convicted of the offenses related to the 2007 abduction, and this appeal follows. We will address Brittain's claimed errors in turn, those being that the trial court erred by (1) denying a motion to complete the record, (2) admitting hearsay evidence under the doctrine of forfeiture by wrongdoing, (3) permitting similar-transaction evidence, and (4) denying his motion for new trial when he received ineffective assistance of counsel in numerous regards.[4]

[4] In a separate enumeration of error, in which he cites no authority and makes only vague and conclusory statements, Brittain contends that the trial court erred in denying a motion for mistrial based on the various errors he alleges in his other enumerations. For all of the reasons given in the various divisions of this opinion that address his other enumerations of error, the trial court did not abuse its discretion in denying a motion for mistrial, and we need not address this enumeration further. *See Boyd v. State*, 275 Ga. 772, 773-74 (1) (573 SE2d 52) (2002) (summarily disposing of appellant's argument that trial court erred in denying motion for mistrial when the reasons for seeking a mistrial had already been found lacking in merit); *Castell v. State*, 250 Ga. 776, 789-90 (8) (a) (301 SE2d 234) (1983) (same). As to any other alleged error in denying a motion for mistrial, "mere conclusory statements are not the type of meaningful argument contemplated" by our rules. *Towry v. State*, 304 Ga. App. 139, 148 (2) (g) n.7 (695 SE2d 683) (2010); *accord Davenport v. State*, 308 Ga. App. 140, 156 (2) (e) (706 SE2d 757) (2011). Thus, Brittain's other arguments in this regard have been abandoned by his failure to provide citation to authority or meaningful argument. *See Goodman v. State*, 293 Ga. 80, 86 (9) n.6 (742 SE2d 719) (2013) (deeming unsupported arguments abandoned). Finally, although he does not

6

1. First, Brittain argues that the trial court erred in denying a motion to complete the record when various DVDs played for the jury at trial and entered into evidence as exhibits were not transcribed.

To begin with, the relevant motion and a subsequent order continuing the motion-for-new-trial hearing do not appear in the appellate record, but Brittain attached a copy of the motion and order as an exhibit to his brief. It is, of course, well established that exhibits attached to an appellate brief, but not appearing in the record transmitted by the trial court, "cannot be considered by this court and afford no basis for reversal."[5] Nevertheless, Brittain's argument that the lack of transcription of the DVDs resulted in an incomplete record is without merit. Indeed, the relevant DVDs were admitted as exhibits into the record. Accordingly, the lack of transcription of the DVDs does not constitute reversible error because the DVDs are available for

directly challenge the sufficiency of the evidence, we note that the evidence was indeed sufficient to sustain his convictions. *See Jackson v. Virginia*, 443 U.S. 307, 309 (99 SCt 2781, 61 LE2d 560) (1979); *Henley v. State*, 285 Ga. 500, 501-02 (1) (678 SE2d 884) (2009).

[5] *Taylor v. State*, 327 Ga. App. 882, 883-84 (1) (761 SE2d 426) (2014) (punctuation omitted); *accord Hughes v. State*, 323 Ga. App. 4, 11 (4) (a) (ii) (746 SE2d 648) (2013); *Jones v. State*, 304 Ga. App. 445, 447 (1) n.10 (696 SE2d346) (2010).

review.[6] And the fact that the DVDs were stopped and interrupted by live questions and testimony, which *were* transcribed, does not alter our conclusion.[7] For these same reasons, Brittain's separate enumeration that his trial counsel rendered ineffective assistance by failing to object to an incomplete transcription of trial is likewise without merit.[8]

2. Next, in a very cursory argument, Brittain contends that the trial court erred in permitting the State to present "multiple hearsay" regarding Jones's May 2007

---

[6] *See Graham v. Wood*, 171 Ga. App. 242, 249 (6) (319 SE2d 484) (1984) (holding that failure to transcribe tape played for jury and properly entered into evidence as an exhibit was not reversible error); *Ellis v. State*, 164 Ga. App. 366, 373 (16) (296 SE2d 726) (1982) (holding that claim of an incomplete record was without merit when record and transcript included tape as an exhibit).

[7] *See Hightower v. State*, 205 Ga. App. 305, 307 (3) (422 SE2d 28) (1992) (holding that the procedure used at trial to play tape recording, which involved interruptions for identification of voices and discussion of what was going on, was appropriate); *cf. Graham*, 171 Ga. App. at 249 (6) (noting that "during their testimony, the officers identified their recorded voices and explained the contents of the played portions, including the police jargon used" such that "the tape served to aurally illustrate each officer's testimony concerning the pursuit of appellants and their victims").

[8] *See, e.g.*, *Porras v. State*, 295 Ga. 412, 420 (3) n.8 (761 SE2d 6) (2014) ("[T]he failure to make a meritless objection cannot amount to ineffective assistance."); *Bradley v. State*, 292 Ga. 607, 614 (5) (740 SE2d 100) (2013) (same).

8

abduction under the forfeiture-by-wrongdoing doctrine when there was no proof that the doctrine should apply.

Although Brittain makes vague reference to alleged hearsay statements by various witnesses, he provides little detail or specific record citations to the statements he contends were admitted in error by the trial court. In this respect, we note that the record and transcripts in this appeal comprise ten volumes with a trial that lasted one week and involved testimony from more than 25 witnesses. Suffice it to say, this Court will not "cull the record in search of error on behalf of a party,"[9] and if we have missed something in the record or misconstrued an argument, "the responsibility rests with counsel."[10]

Additionally, Brittain appears to conflate arguments regarding his Sixth Amendment right to confront the witnesses against him with the admission of certain hearsay evidence.[11] Nevertheless, we will address both of these contentions in turn.

---

[9] *Adams v. State*, 322 Ga. App. 782, 784 (1) (746 SE2d 261) (2013) (punctuation omitted); *accord Burrowes v. State*, 296 Ga. App. 629, 631 (1) (675 SE2d 518) (2009).

[10] *Adams*, 322 Ga. App. at 784 (1) (punctuation omitted); *accord Burrowes*, 296 Ga. App. at 631 (1).

[11] *See generally Yancey v. State*, 275 Ga. 550, 557 (3) (570 SE2d 269) (2002) ("The Confrontation Clause may bar the admission of some evidence that would be

(a) *Sixth Amendment Right to Confrontation.* Prior to trial, the State filed a motion seeking to permit the admission of law enforcement's videotaped interviews with Jones pursuant to the doctrine of forfeiture by wrongdoing. And following a hearing on this motion, the trial court determined that the State had shown by a preponderance of the evidence that Brittain procured Jones's unavailability to testify at trial and ruled that the testimonial evidence would be admissible. Brittain appears to take issue with this determination.

Our analysis necessarily begins with the text of the Sixth Amendment to the United States Constitution, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[12] This clause applies to witnesses against the accused—"in other words, those who 'bear testimony'"[13] and, consistent with the framers' original understanding, "[t]estimonial statements of witnesses absent from trial have been admitted only

---

admissible under an exception to the hearsay rule. The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied." (punctuation and citation omitted)).

[12] U.S. CONST. amend. VI.

[13] *Crawford v. Washington*, 541 U.S. 36, 51 (III) (A) (124 SCt 1354, 158 LE2d 177) (2004).

10

where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."[14] Additionally, the Supreme Court of the United States has determined that interrogations by law-enforcement officers fall within the ambit of testimonial statements with which the Confrontation Clause is concerned.[15]

Nevertheless, in *Giles v. California*,[16] the Supreme Court of the United States made clear that, notwithstanding a criminal defendant's Sixth Amendment right to confront the witnesses against him, the common-law doctrine of forfeiture by

---

[14] *Id.* at 59 (IV).

[15] *Id.* at 53 (III) (A). We note that 911 calls, or portions of 911 calls, can also fall under the category of "testimonial statements," depending on a determination as to the primary purpose for the call. *See Michigan v. Bryant*, __ U.S. __, __ (III)(B) (131 SCt 1143, 179 LE2d 93) (2011) (noting that "a conversation which begins as an interrogation to determine the need for emergency assistance can evolve into testimonial statements" and that, when this happens, a trial court can exclude the portions of those statements that are testimonial in nature); *Davis v. Washington*, 547 U.S. 813, 823-29 (III) (A) (126 SCt 2266, 165 LE2d 224) (2006) (evaluating the primary purpose of a 911 call to determine whether statements were testimonial or non-testimonial); *see also Philpot v. State*, 309 Ga. App. 196, 203 (1) (b) (709 SE2d 831) (2011). However, Brittain does not appear to take issue with the State's admission of the 911 call in the case *sub judice* as part of the *res gestae*, having stipulated to the call occurring at or near the time of the events in question. *See* Former OCGA § 24-3-3 ("Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, shall be admissible in evidence as part of the res gestae."). Nor does he contend that trial counsel was ineffective in so stipulating.

[16] 554 U.S. 353 (128 SCt 2678, 171 LE2d 488) (2008).

wrongdoing permits the introduction of statements made by a witness who has been

"'detained' or 'kept away' by the 'means or procurement' of the defendant."[17] Indeed,

Justice Scalia—after briefly describing the founding-era history of this

doctrine—succinctly explained in *Giles* that "[t]he terms used to define the scope of

the forfeiture rule suggest that the exception applied only when the defendant

engaged in conduct *designed* to prevent the witness from testifying."[18]

The Supreme Court of the United States first addressed the doctrine of

forfeiture by wrongdoing in *Reynolds v. United States,*[19] adopting the rule at that

time.[20] Indeed, the doctrine was referenced in two of the Court's other seminal

---

[17] *Id.* at 359 (II) (A).

[18] *Id.* at 359 (II) (A); *see also id.* at 361 (II) (B) ("The manner in which the rule was applied makes plain that unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying."); *id.* at 365 (II) (B) ("But as the evidence amply shows, the 'wrong' and the 'evil Practices' to which these statements referred was conduct *designed* to prevent a witness from testifying.").

[19] 98 U.S. 145 (25 LEd 244) (1878).

[20] *Giles*, 554 U.S. at 366-67 (II) (C) (noting adoption of forfeiture-by-wrongdoing doctrine in *Reynolds*); *see Reynolds*, 98 U.S. at 158 (4) ("The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused

Confrontation Clause cases, *Crawford v. Washington*[21] and *Davis v. Washington.*[22]

But in *Giles*, the Court made clear, in no uncertain terms, that the doctrine applies

even when the defendant has not had a prior opportunity to confront the witness by

---

person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.").

[21] 541 U.S. 36, 62 (V) (A) (124 SCt 1354, 158 LE2d 177) (2004) ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability.").

[22] 547 U.S. 813, 833 (IV) (126 SCt 2266, 165 LE2d 224) (2006) ("[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford*: that 'the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds.' That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." (citation omitted) (ellipsis in original)).

cross examination,[23] and even cited to a case from our own Supreme Court—*Williams v. State*[24]—to reinforce this long-held understanding of the rule.[25]

Finally, although the Supreme Court of the United States has taken no position on the standard necessary to demonstrate forfeiture by wrongdoing, it has noted that both federal and state courts tend to hold the Government to a preponderance-of-the-

---

[23] *See Giles*, 554 U.S. at 373 (II) (D) (1) ("[W]e are not persuaded to displace the understanding of our prior cases that wrongful procurement permits the admission of prior unconfronted testimony. . . . Prior *confronted* statements by witnesses who are unavailable are admissible whether or not the defendant was responsible for their unavailability. If the forfeiture doctrine did not admit unconfronted prior testimony at common law, the conclusion must be, not that the forfeiture doctrine requires no specific intent in order to render unconfronted testimony available, but that unconfronted testimony is subject to no forfeiture doctrine at all." (citation omitted)).

[24] *Williams v. State*, 19 Ga. 402, 402-03 (1856) ("It was resolved, upon the trial of Lord *Morley*, for murder . . . that in case oath should be made that any witness who had been examined by the Crown, and was then absent, was detained by the means or procurement of the prisoner, and the Court should be satisfied from the evidence, that the witness was detained by means or procurement of the prisoner, then the examination should be read; and that whether the witnesses was so detained, was matter of fact of which the Jury and not the Court, were the judges . . . . We do not think that the 6th article of the amendments to the Constitution of the United States . . . has any bearing upon this point. The practice intended to be prohibited by that provision, was the secret examinations, so much abused during the reign of the Stuarts, and was not intended to disturb any great rule of criminal evidence.").

[25] *Giles*, 554 U.S. at 371 (II) (D) (1) (citing *Williams*, 19 Ga. at 403).

evidence standard to establish same.[26] Thus, we will review Brittain's enumeration of error using that standard.[27]

In the case *sub judice*, the State sought permission to admit at trial Jones's testimonial statements to law enforcement—which were memorialized in videotaped interviews—and sought to show that Brittain caused Jones's 2008 disappearance in order to prohibit her from testifying against him. And at the hearing, the State presented the testimony of various friends, family members, and law-enforcement agents who described the circumstances of Jones's 2008 disappearance.

This evidence shows that on the morning of June 28, 2008, Jones left her baby daughter with her best friend with the intent to return for the child later that morning; however, Jones never came back for her child and did not respond to numerous phone calls from the friend or the friend's mother. The friend testified that neither was typical of Jones's behavior and was instead quite unusual. The friend then went to Jones's house around 2:30 p.m., just as Jones's older daughter was returning home

---

[26] *Davis*, 547 U.S. at 833 (IV) ("We take no position on the standards necessary to demonstrate such forfeiture, but federal courts using Federal Rule of Evidence 804 (b) (6), which codifies the forfeiture doctrine, have generally held the Government to the preponderance-of-the-evidence standard. State courts tend to follow the same practice." (citations omitted)).

[27] *See id.*

from school. There was neither an answer at the door to the home nor, again, to Jones's phone, so the friend decided to call Jones's mother (with whom Jones lived); but the mother had not heard from Jones either. The friend then picked up Jones's oldest child from school. Again, it was Jones's usual practice to pick her son up from school, but she had not done so on this particular day.

Then, upon returning to Jones's residence, the friend and Jones's mother entered the home. As they walked through the house, they began to notice things that were amiss in the usually tidy abode: knives lying out on the kitchen counter; a bedroom TV left turned on; an ironing board left out in Jones's upstairs bedroom; an emergency trunk-release severed from a vehicle and sitting on the floor beside the ironing board; the baby's stroller sitting in the garage (when it would normally be in the trunk of Jones's missing car); and drops of blood in the garage and portions of the house, including leading upstairs and in a bathtub.

Law enforcement then arrived on the scene and observed these same things, in addition to a gunshot hole in the ceiling outside of Jones's bedroom and a strange liquid leading from her room, down the stairs, and out into the garage.[28] Thus, given

---

[28] At trial, law enforcement further testified that the liquid was consistent with starch used in ironing, and Jones's iron was missing from the home. As such, law enforcement believed that Jones had been bound with the iron's cord.

the blood and other unusual circumstances, foul play was immediately suspected. Then, the next morning, Jones's abandoned vehicle was located, its trunk containing the same strange liquid and a "substantial amount" of blood. A subsequent DNA test of the blood linked it to a descendent of Jones's mother, and Jones was an only child. Following the June 2008 disappearance, Jones was never seen or heard from again, though her mother could not yet bring herself to have her daughter declared dead.

Police immediately suspected Brittain, who was not incarcerated at the time, in Jones's disappearance after speaking with her family and friends, and they linked Brittain to Tinch, who worked in the DFCS office where Jones had recently applied for food stamps. In addition to this testimony, the State also presented the testimony of Brittain's former cellmate, who claimed that Brittain said he was not worried about Jones testifying against him at his trial.

At the hearing's conclusion, the State asked that the trial court permit it to introduce into evidence at trial Jones's statements to law-enforcement officers and her videotaped interviews. And finding by a preponderance of the evidence that Brittain had procured Jones's absence for purposes of preventing her testimony, the trial court agreed. Accordingly, contrary to Brittain's contentions that there was a lack of proof to show that the doctrine of forfeiture by wrongdoing should apply, the record reflects

17

that the trial court was presented with ample evidence to support its finding by a preponderance of the evidence, and that finding was not clearly erroneous.[29] As such, Brittain has not established any violation of his Confrontation Clause rights.

(b) *Hearsay.* In addition to the testimonial hearsay statements Jones made to law enforcement, at trial, the court also admitted non-testimonial hearsay statements Jones made to friends regarding her abduction by Brittain in 2007. Brittain appears to take issue with the admission of both the testimonial and non-testimonial hearsay under the forfeiture-by-wrongdoing exception.

Brittain's case was tried in 2011, prior to the effective date of Georgia's new evidence code.[30] But assuming, without deciding, that the trial court admitted testimonial and non-testimonial hearsay under the forfeiture-by-wrongdoing doctrine[31] *and* that the prior evidence code would not have permitted admission of

---

[29] *See United States v. Montague*, 421 F3d 1099, 1104 (II) (10th Cir. 2005) (finding that trial court's determination as to applicability of forfeiture-by-wrongdoing doctrine was not clearly erroneous).

[30] *See* Ga. L. 2011, p. 99, § 101 (explaining that the provisions of Georgia's new evidence code "apply to any motion made or hearing or trial commenced on or after" January 1, 2013).

[31] The State argues that the trial court admitted non-testimonial hearsay not under the forfeiture-by-wrongdoing doctrine but instead under the exception of *res gestae* when it permitted Jones's friends to testify regarding statements she made

18

hearsay evidence under a forfeiture-by-wrongdoing exception,[32] any error in the admission of same does not justify reversal because the same evidence would be admissible at a second trial. Indeed, Georgia's new evidence code has codified the forfeiture-by-wrongdoing exception for hearsay evidence,[33] providing that "[a]

---

during early-morning calls to ask that they check on her child. Brittain makes no argument in this regard, but we note that those calls to Jones's friends were made *prior* to her 911 call, which Brittain stipulated to having been made at or near the time of the incident. *See supra* note 15. Suffice it to say, it is difficult to imagine how Brittain could stipulate to the 911 call having been made at or near the time of the incident in question but then somehow argue that frantic calls to friends made *before* the 911 call were not also made at or near the time of the incident in question. *See* Former OCGA § 24-3-3 ("Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, shall be admissible in evidence as part of the res gestae."). Nevertheless, even if Jones's statements to friends were not properly admitted as *res gestae*, her statements to them that Brittain had kidnapped her were cumulative of the 911 call. *See Miller v. State*, 325 Ga. App. 764, 772 (4) (c) (754 SE2d 804) (2014) ("The erroneous admission of hearsay is harmless where, as here, legally admissible evidence of the same fact is introduced. In such a case, the hearsay is cumulative and without material effect on the verdict." (punctuation omitted)); *accord Williams v. State*, 319 Ga. App. 888, 890 (1) (739 SE2d 4) (2013).

[32] *But see Yancey*, 275 Ga. at 553 (2) (a) (explaining that Former OCGA § 24-3-1 (b), the so-called "necessity exception," had been interpreted "as creating a residual exception to the hearsay rule"); *Higgs v. State*, 256 Ga. 606, 607 (3) (351 SE2d 448) (1987) (suggesting that Former OCGA §§ 24-3-3 to 24-3-14, which enumerated 12 types of hearsay exceptions, were not exhaustive); *Williams*, 19 Ga. at 403 (discussing the common-law forfeiture-by-wrongdoing exception).

[33] *See* OCGA § 24-8-804 (b) (5); *see generally* RONALD L. CARLSON & MICHAEL SCOTT, CARLSON ON EVIDENCE 509-14 (2d. ed. 2014) (discussing the

statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" shall not be excluded by the hearsay rule if the declarant is unavailable as a witness.[34]

Because OCGA § 24-8-804 (b) (5) is a procedural statute, it would apply to a retrial if we were to reverse this case.[35] Accordingly, even if the trial court erroneously admitted testimonial and non-testimonial hearsay under the prior evidence code, the same evidence would be properly admitted at a second trial due to a procedural change in the laws of evidence.[36]

---

forfeiture exception to the hearsay rule in Georgia's new evidence code); PAUL S. MILICH, GEORGIA RULES OF EVIDENCE § 19:35 (2014) (same).

[34] OCGA § 24-8-804 (b) (5).

[35] *See Murphy v. Murphy*, 295 Ga. 376, 377 (761 SE2d 53) (2014) ("[G]enerally when a statute governs only court procedure it is to be applied retroactively in the absence of an express contrary intention."); *see also Williams v. State*, 297 Ga. App. 626, 627 (677 SE2d 773) (2009) ("Where a statute governs only court procedure, including the rules of evidence, it is to be given retroactive effect absent an expressed contrary intention.").

[36] *See Mortimer v. State*, 100 So3d 99, 101-04 (Fla. Dist. Ct. App. 2012) (holding that even though trial court erroneously applied common law rule of forfeiture by wrongdoing to admit hearsay testimony otherwise inadmissible under evidence code, there was no reversible error because evidence code had since been amended to codify the common law rule). *See generally United States v. Natson*, 469 FSupp2d 1243, 1250 (B) (M.D. Ga. 2006) (discussing Federal Rule of Evidence 804 (b) (6) and explaining that "if it is established that the party, through wrongdoing,

As discussed in Division 2 (a) *supra*, the trial court was not clearly erroneous in determining (by a preponderance of the evidence) that Brittain procured Jones's unavailability for the purpose of preventing her testimony. And to the extent that Brittain argues that there was a lack of evidence of unavailability because the State did not attempt to subpoena Jones, we note that "[a] finding regarding the inaccessibility of a witness and a party's diligence in searching for a witness lies within the sound discretion of the trial court, and, absent a manifest abuse of discretion, will not be disturbed on appeal."[37] Here, there was no abuse of discretion in the trial court's determination that Jones had been rendered "unavailable" when the evidence showed that Jones—a single mother to three children—suddenly vanished under circumstances that immediately suggested foul play and were investigated by

procured the unavailability of the witness, that party has forfeited his right to assert hearsay objections to the admission of the unavailable witness' prior statements").

[37] *Carter v. State*, 266 Ga. App. 691, 692 (1) (598 SE2d 76) (2004); *see also Jones v. State*, 250 Ga. 166, 168 (2) (296 SE2d 598) (1982) ("Whether appellant exercised [due] diligence . . . was a factual question addressed to the trial judge's discretion."); *Johnson v. State*, 197 Ga. App. 384, 385 (1) (398 SE2d 432) (1990) ("The sufficiency of the search is left to the sound discretion of the trial court, and its judgment will not be disturbed on appeal absent abuse.").

21

law enforcement, and she had not been heard from in the years since her disappearance.[38]

As for the testimony of the cellmate regarding the information Brittain shared with him (which Brittain seems to contend was inadmissible hearsay), we note that this testimony was admissible because "a defendant's incriminating statement is admissible when it constitutes an admission against the defendant's penal interest [and] a *defendant's* declaration against penal interest is the admission of a party-opponent."[39] This applies to Brittain's statements tending to implicate himself in the murder of Brutus Jones, the 2007 abduction of Chastity Jones, the commission

---

[38] *Cf. Carter*, 266 Ga. App. at 692 (1) (holding that trial court did not abuse its discretion in finding that appellant failed to establish unavailability when appellant relied upon three attempts to serve a subpoena, declined an offered continuance, and "otherwise only speculat[ed] that [the witness] might be in Florida and indicat[ed] that the State sought him as well"); *Johnson*, 197 Ga. App. at 385 (1) (holding that trial court did not abuse its discretion in finding that appellant "had not really done much to find the witness" when no other efforts were made than to attempt contact with the witness at an address from which notices were returned stamped "no such address").

[39] *Bryant v. State*, 288 Ga. 876, 888 (9) (a) (708 SE2d 362) (2011) (punctuation omitted); *accord Teal v. State*, 282 Ga. 319, 327 (3) (647 SE2d 15) (2007); *see* Former OCGA § 24-3-34 ("Admissions by a real party in interest shall be admissible . . . ."); *see also Gordon v. State*, 273 Ga. 373, 378 (4) (f) (541 SE2d 376) (2001) ("On direct examination a witness for the State testified that [the defendant] told her he 'could get away with anything he wanted to do, even murder.' The statement was admissible as an admission by the accused against his penal interest.").

22

of robberies with Brutus Jones, and similar transactions admitted at trial.[40] Accordingly, any inadmissible hearsay from other sources as to these matters was cumulative.[41] Additionally, some of Brittain's statements to the cellmate were cumulative of Chastity Jones's recorded statements regarding her interactions with Brittain on the evening in question.[42]

Finally, although Brittain contends that the State only introduced hearsay evidence to establish similar transactions at trial, this contention is likewise without merit for the reasons explained *infra*.

3. Next, Brittain argues that the trial court erred by admitting evidence of similar transactions "in the absence of proof that [he] was connected to the alleged similar transactions and in the absence of the other incidents being similar." And

---

[40] *See Griffin v. State*, 302 Ga. App. 807, 808-09 (692 SE2d 7) (2010) ("An admission is the avowal of a fact or of circumstances from which guilt may be inferred, but only tending to prove the offense charged and not amounting to a confession of guilt." (punctuation omitted)); *accord Williams v. State*, 246 Ga. App. 347, 350 (1) (540 SE2d 305) (2000).

[41] *See Miller*, 325 Ga. App. at 772 (4) (c) ("The erroneous admission of hearsay is harmless where, as here, legally admissible evidence of the same fact is introduced. In such a case, the hearsay is cumulative and without material effect on the verdict." (punctuation omitted)); *accord Williams*, 319 Ga. App. at 890 (1).

[42] *See Miller*, 325 Ga. App. at 772 (4) (c); *Williams*, 319 Ga. App. at 890 (1).

23

parsing through appellant's brief and this specific enumeration of error (which, yet again, is bereft of any citation to authority or the record), it appears that Brittain also contends that the trial court erred in permitting the State to present evidence of similar transactions by proffer in lieu of witness testimony. Once again, we disagree.[43]

The record reflects that the State filed notice of its intent to introduce evidence of various similar transactions, including the 2006 murder, kidnaping, and aggravated assault of Octavia Atkins and the 2007 breaking and entering into the home of Samiah Blake. The State sought to introduce these incidents to show "course of conduct, bent of mind, plan, scheme, motive, identity, intent, and lack of mistake." Similar-transaction evidence was admissible under our former evidence code if the State showed that

> (1) it [sought] to introduce the evidence not to raise an improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general rule of admissibility; (2) there [was] sufficient evidence to establish that the accused committed the independent offense or act; and (3) there [was]

---

[43] For the same reasons, Brittain's separate enumeration that his trial counsel rendered ineffective assistance by failing to object to the similar-transaction evidence or pre-trial hearing procedure is without merit. *See, e.g.*, *Porras*, 295 Ga. at 420 (3) n.8 ("[T]he failure to make a meritless objection cannot amount to ineffective assistance.").

24

a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter.[44]

Prior to Brittain's trial for Jones's 2007 abduction, the trial court conducted a hearing at which it permitted the State to introduce by proffer the facts of two similar transactions. Then, at the conclusion of each proffer, the trial court determined that the facts were sufficiently similar to those at issue in the prosecution for burglary, aggravated assault, and kidnaping of Jones.

First, as to Brittain's argument that the trial court erred by permitting the State to present pre-trial evidence of the similar transactions by proffer (as opposed to witness testimony), we have previously rejected the argument that such a pre-trial procedure is erroneous when a defendant has the opportunity to cross-examine similar-transaction witnesses at trial.[45]

---

[44] *Matthews v. State*, 294 Ga. 50, 51 (3) (a) (751 SE2d 78) (2013) (punctuation omitted); *see Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991) (establishing the three-prong test).

[45] *See, e.g.*, *Sheppard v. State*, 300 Ga. App. 261, 262-63 (1) (2009) ("We have repeatedly approved of such a procedure; the question is 'whether [the] defendant was deprived of any substantial rights' by the proffer." (punctuation omitted)); *Ellis v. State*, 282 Ga. App. 17, 23 (3) (b) (637 SE2d 729) (2006) (rejecting argument that defendant was deprived of "substantial rights" by State's proffer of witness testimony as to similar transactions at pre-trial hearing).

Second, as to Brittain's argument that the evidence was insufficient to show the necessary similarities between the charged offense and the other incidents, this contention is likewise without merit. We note, of course, that "[a]bsolute proof is not required that a defendant committed the offense in a similar transaction."[46] Instead, the State need only prove that the defendant "committed the prior offense by a preponderance of the evidence."[47] Additionally, in determining the admissibility of similar-transaction evidence, "the court should focus on the similarities, not the differences, of the two occurrences."[48]

(a) *Octavia Atkins.* At the pretrial hearing, the State proffered evidence regarding the murder, kidnaping, and aggravated assault of Octavia Atkins in Forsyth County in August 2006, less than one year prior to Jones's May 2007 abduction. The State's proffer showed that Atkins was the girlfriend of Dandre Shabazz, who—like

[46] *Miller*, 325 Ga. App. at 767 (2) (a) (punctuation omitted); *accord Dean v. State*, 321 Ga. App. 731, 733 (1) (a) (742 SE2d 758) (2013).

[47] *Miller*, 325 Ga. App. at 767 (2) (a); *see also Dean*, 321 Ga. App. at 731 (1) (a).

[48] *Lowe v. State*, 245 Ga. App. 659, 660 (2) (538 SE2d 552) (2000) (punctuation omitted); *see also Archie v. State*, 249 Ga. App. 657, 658 (549 SE2d 480) (2001) ("In determining if an independent act is sufficiently like the current crime, a court must focus on the similarities of the occurrences rather than their differences.").

Brutus Jones—was a member of Brittain's restaurant-robbery crew. Shabazz was taken into custody in 2006 and made an agreement with Brittain that Brittain would provide Atkins with money during his incarceration.

In August 2006, Atkins's nude body was found in an abandoned Forsyth County home with (1) ligature/strangulation marks about her neck , (2) her feet covered in mud, and (3) her body dirtied with foliage. And just a few days before the discovery of her body, she received a portion of the money Brittain promised. DNA evidence recovered from the body could not exclude Brittain as a suspect, and the location of her body was not far from the scene of a restaurant robbery Brittain allegedly committed with Atkins's boyfriend. Additionally, Atkins's vehicle was later found one mile from Brittain's home. At trial, the State established all of these facts

by the testimony of Shabazz[49] and investigating officers.[50] The State also presented the testimony of Brittain's cellmate, to whom he mentioned Octavia Atkins.

The trial court appropriately determined that the facts of the Atkins murder were sufficiently similar to the abduction of Jones in that both cases involved the kidnaping of a significant other of a member of Brittain's restaurant-robbing crew, both victims were left with ligature marks, and both were taken to secluded wooded

---

[49] To the extent that there was inadmissible hearsay testimony as to statements Brutus Jones made regarding Brittain's involvement with Shabazz, these statements were merely cumulative of Shabazz's own testimony as to his criminal involvement with Brittain and the agreement that Brittain would fund Atkins during Shabazz's incarceration. *See Miller*, 325 Ga. App. at 772 (4) (c) ("The erroneous admission of hearsay is harmless where, as here, legally admissible evidence of the same fact is introduced. In such a case, the hearsay is cumulative and without material effect on the verdict." (punctuation omitted)); *accord Williams*, 319 Ga. App. at 890 (1).

[50] At the pre-trial hearing, the State indicated that cell-phone records would show that just prior to going missing, Atkins and Brittain were in the same vicinity. Although it does not appear that the State established this fact at trial, the State presented other evidence to connect Brittain to the crime, including testimony that Brittain backtracked on his initial denial of having contact with Atkins after he was confronted with the fact that her car was discovered near his home; that Brittain told law enforcement that there were "rumors" about him killing Atkins and dumping her in the woods (when the location of her body was not common knowledge); and that when robbing restaurants, Brittain used a high-powered drill and special gel to break into safes, and Atkins's body was found lying in a gel-like substance.

areas.[51] Additionally, both women were taken to parts of the suburban metro Atlanta area with which Brittain was alleged to have independent familiarity from committing robberies. Accordingly, based on the foregoing similarities, we cannot say that the trial court abused its discretion in admitting this evidence.[52]

(b) *Samiah Blake.* As to Samiah Blake, at the pretrial hearing, the State proffered evidence regarding an incident in which Brittain broke into her home to confront her. Specifically, the State showed that between March and April of 2007 (not long before Jones's 2007 abduction), Brittain was romantically involved with Blake. Early one morning during that time period, while alone, Blake suddenly encountered Brittain in her home.

Brittain confronted Blake with a handgun, and she was unsure of how he had obtained access to her home, though it was later determined that he had hidden in and

---

[51] *See Kimbrough v. State*, 281 Ga. 885, 886 (2) (a) (644 SE2d 125) (2007) (holding that facts of two incidents were sufficiently similar because "in both cases [the defendant] invaded a woman's home at night through a back window, attacked the woman, stole her personal items, and left in her car").

[52] *See Evans v. State*, 288 Ga. 571, 573 (3) (707 SE2d 353) (2011) ("We cannot say that the trial court's admission of this evidence, based on the similarities that [the defendant] used a handgun, committed the offenses with little or no provocation, fled the scene, and attempted to cause serious injury or death in the same immediate location, was an abuse of discretion.").

descended from her attic. At trial, Blake testified to these facts and also to the fact that Brittain told her that he came in through the basement before hiding in her attic, presumably all night.

Following the State's proffer, the trial court found the incident sufficiently similar and, in doing so, the trial court did not err. Indeed, both incidents involved victims known to Brittain, his surreptitious entry into their homes during early morning hours, and confrontations with a handgun.[53] Accordingly, this enumeration of error likewise lacks merit.

4. Finally, Brittain contends that he received ineffective assistance of counsel in numerous regards. But before addressing his contentions, we note that, in general, when a defendant claims that his trial counsel was ineffective, he has the burden of

---

[53] *See Alexander v. State*, 276 Ga. App. 288, 289-90 (1) (623 SE2d 160) (2005) (holding that trial court did not abuse its discretion in admitting similar-transaction evidence when "both of the prior incidents involved [the defendant's] unauthorized nighttime entry into the homes of individuals living in close proximity to him" and acquainted with him); *see also Hicks v. State*, 232 Ga. 393, 396-97 (207 SE2d 30) (1974) (holding that incidents were sufficiently similar for admission when all three involved burglary in the early hours of the morning; entry was made through either an unlocked window or an unlocked glass door; the culprit took small items, such as jewelry, money and guns; no fingerprints were left because the intruder wore gloves; a hat was pulled down to conceal the intruder's identity; each involved a forcible sexual assault on the wife at gunpoint and a threat of harm to other members of the family; and the crimes occurred within a 6-month period, in a common geographical area).

establishing that "(1) his attorney's representation in specified instances fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[54] And when a trial court determines that a defendant did not receive ineffective assistance, we will affirm that decision on appeal unless it is clearly erroneous.[55] With these guiding principles in mind, we turn now to Brittain's specific arguments.

(a) *Abandoned arguments.* In the portion of Brittain's appellate brief devoted to his claim of having received ineffective assistance of counsel, he lists eleven instances in which he contends that trial counsel performed deficiently, including five inexplicable sub parts to one of these instances. However, most of Brittain's contentions arise to no more than a list of short, vague, conclusory statements.[56] And

---

[54] *Muldrow v. State*, 322 Ga. App. 190, 193 (2) (b) (744 SE2d 413) (2013) (punctuation omitted); *accord Owens v. State*, 317 Ga. App. 821, 823 (1) (733 SE2d 16) (2012).

[55] *Muldrow*, 322 Ga. App. at 193 (2) (b); *accord Owens*, 317 Ga. App. at 823 (1).

[56] These include, very generally, Brittain's arguments regarding trial counsel's alleged failure to file defensive motions, pursue an alibi defense, file a motion to "reveal the deal" offered to the cellmate, object to certain testimony from the cellmate, object to hearsay testimony, interview Brittain's former cellmate, locate

31

pursuant to the rules of this Court, an appellant must support enumerations of error with argument and citation of authority,[57] and "mere conclusory statements are not the type of meaningful argument contemplated" by our rules.[58] Accordingly, the majority of Brittain's arguments in this regard have been abandoned by his failure to provide citation to authority or meaningful argument and will not be addressed.[59]

---

Jones's rescuers, speak with Jones's leasing agent, and compel or subpoena certain records.

[57] *See* Court of Appeals Rule 25 (a) (3) (providing that part three of appellant's brief "shall contain the argument and citation of authorities" and "a concise statement of the applicable standard of review with supporting authority for each issue presented in the brief"); *see also* Court of Appeals Rule 25 (c) (2) (providing that "[a]ny enumeration of error which is not supported in the brief by citation of authority or argument may be deemed abandoned").

[58] *Towry v. State*, 304 Ga. App. 139, 148 (2) (g) n.7 (695 SE2d 683) (2010); *accord Davenport v. State*, 308 Ga. App. 140, 156 (2) (e) (706 SE2d 757) (2011).

[59] *See Goodman*, 293 Ga. at 86 (9) n.6 (deeming arguments abandoned when appellant failed to "address the appellate standard for establishing ineffective assistance of counsel as to all instances underlying the enumerations of error that appear in her brief"); *Humphrey v. Riley*, 291 Ga. 534, 544 (II) (I) (731 SE2d 740) (2012) (deeming portions of ineffective-assistance-of-counsel argument abandoned when several claims were "not supported by specific citation or argument" in violation of Supreme Court Rule 22); *Patterson v. State*, 327 Ga. App. 695, 698 (3) (761 SE2d 101) (2014) (deeming arguments of ineffective assistance abandoned when alleged errors were not "supported with any further argument, citations to the record, or legal authority"); *Wynn v. State*, 322 Ga. App. 66, 71 (4) (b) (744 SE2d 64) (2013) (deeming portions of argument abandoned when they were "not supported by specific citation or argument").

(b) *Failure to cross-examine cellmate regarding first-offender sentences.* Brittain gives slightly more attention to his argument that trial counsel rendered ineffective assistance by failing to cross-examine a former cellmate regarding the fact that he had twice been sentenced as a first offender. Nevertheless, he fails to establish that counsel rendered ineffective assistance in this regard.

The record reflects that Brittain's cellmate pleaded guilty in 2004 to possessing less than one ounce of marijuana, a misdemeanor,[60] and was sentenced as a first offender under OCGA § 16-13-2.[61] Brittain takes issue with the fact that the cellmate then later pleaded guilty to reduced charges in Clayton County in 2009 and requested first-offender treatment without informing the trial court that he had formerly been given such treatment in the misdemeanor drug-possession case. However, this second

---

[60] *See* OCGA § 16-13-2 (b) ("[A]ny person who is charged with possession of marijuana, which possession is of one ounce or less, shall be guilty of a misdemeanor and punished by imprisonment for a period not to exceed 12 months or a fine not to exceed $1,000.00, or both, or public works not to exceed 12 months.").

[61] *See* OCGA § 16-13-2 (a) ("Whenever any person who has not previously been convicted of any offense under Article 2 or Article 3 of this chapter or of any statute of the United States or of any state relating to narcotic drugs, marijuana, or stimulant, depressant, or hallucinogenic drugs, pleads guilty to or is found guilty of possession of a narcotic drug, marijuana, or stimulant, depressant, or hallucinogenic drug, the court may without entering a judgment of guilt and with the consent of such person defer further proceedings and place him on probation upon such reasonable terms and conditions as the court may require . . . .").

33

first-offender sentence was entered pursuant to OCGA § 42-8-60,[62] an entirely

separate statute,[63] and Brittain presents nothing to show or even suggest that the

cellmate's prior treatment as a first offender was also under OCGA § 42-8-60 and *not*

OCGA § 16-13-2. As such, there is no evidence that the cellmate was ineligible for

first-offender treatment under OCGA § 42-8-60 in 2009,[64] and Brittain has therefore

---

[62] *See* OCGA § 42-8-60 (a) (1), (2) ("Upon a verdict or plea of guilty or a plea of nolo contendere, but before an adjudication of guilt, in the case of a defendant who has not been previously convicted of a felony, the court may, without entering a judgment of guilt and with the consent of the defendant . . . [d]efer further proceeding and place the defendant on probation as provided by law; or . . . [s]entence the defendant to a term of confinement as provided by law.").

[63] *See State v. Stinson*, 278 Ga. 377, 380 (602 SE2d 654) (2004) ("OCGA § 16-13-2 (a), which authorizes alternative treatment like that afforded [the appellee], similarly to OCGA § 42-8-60, gives the trial court the discretion to withhold an adjudication of guilt, defer further proceedings, and place the defendant on probation. OCGA § 16-13-2 (a) gives the defendant who pleads guilty to or is found guilty of a drug violation the option, with the trial court's assent, of undergoing a comprehensive rehabilitation program. As in the first offender provisions, the alternative treatment offered under OCGA § 16-13-2 (a), confers substantial benefits upon the defendant."); *Andrews v. State*, 276 Ga. App. 428, 430 (1) (623 SE2d 247) (2005) ("Under OCGA § 16-13-2 (a), the trial court has the discretion to withhold an adjudication of guilt and defer sentencing for drug-related crimes, with the possibility of a complete discharge and dismissal if the defendant successfully completes a probationary period. As such, OCGA § 16-13-2 has been compared to the state's 'first offender' statute, OCGA § 42-8-60.").

[64] *Cf. Smith v. State*, 322 Ga. App. 549, 552 (1) (a) (745 SE2d 771) (2013) (holding that defendant's failure to disclose prior qualifying drug conviction at sentencing as first offender upon negotiated guilty plea for possession of cocaine

34

failed to establish that he was in any way prejudiced by counsel's failure to cross-examine the cellmate regarding this issue to attack the cellmate's credibility.[65]

Accordingly, for all of the foregoing reasons, we affirm Brittain's convictions.

*Judgment affirmed. Doyle, P. J., and Miller, J., concur*.

---

waived defendant's claim that first offender conditional discharge sentence of probation was void due to prior drug conviction); *Stafford v. State*, 251 Ga. App. 203, 203-05 (554 SE2d 219) (2001) (holding that First Offender Act, OCGA § 42-8-60, which allowed courts to defer further proceedings and place defendants who had no previous felony convictions on probation, applied to misdemeanor convictions such that, because he availed himself of the First Offender Act after pleading guilty to simple battery, he could not again avail himself of it a second time); *Cunningham v. State*, 239 Ga. App. 889, 891 (1) (522 SE2d 480) (1999) (holding that defendant convicted pursuant to guilty plea and sentenced as first felony offender was not entitled to withdraw guilty plea at resentencing hearing brought about by State's discovery after initial sentencing that he was ineligible for first offender treatment because he had previously been sentenced in different prosecution as a first felony offender).

[65] *See Smith v. State*, 292 Ga. 588, 591-92 (4) (b) (740 SE2d 129) (2013) (rejecting ineffective-assistance-of-counsel argument when defendant failed to "establish any prejudice as to counsel's cross-examination" of witness).