**THIRD DIVISION
DILLARD, P. J.,
GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**February 26, 2020**

# In the Court of Appeals of Georgia

A19A1805. COUSIN v. TUBBS.

DILLARD, Presiding Judge.

In this domestic-relations proceeding, Herbert Cousin, Jr.—the father of minor child K. T.—appeals from an order in which the trial court, in relevant part, (1) denied his request to have K. T.'s mother, Adrian Tubbs, held in contempt of a prior custody order, (2) found him in contempt for failing to fully comply with his prior child-support obligations, and (3) granted Tubbs's request for an upward modification of his child-support obligations. For the reasons that follow, we affirm in all respects except as to the trial court's imposition of a high-income deviation from Cousin's presumptive child-support obligation, which we vacate. Consequently, we remand this case for further proceedings consistent with this opinion.

Viewed in the light most favorable to the trial court's rulings,[1] the record shows that K. T. was born in November 2011 and has lived with Tubbs his entire life; the parties never married. In 2012, Cousin was ordered to pay $217 per month in child support, provide health insurance for K. T., and pay a portion of K. T.'s unreimbursed medical expenses. In June 2013, the parties agreed to a "Parenting Plan" that was memorialized in a court order. Under the Parenting Plan, Tubbs retained legal and primary physical custody of K. T., and Cousin was entitled to visitation every other weekend, as well as additional times during holidays and vacations.

But over the next several years, Cousin exercised his visitation rights only 12 times out of 140 opportunities to do so, and he never exercised his rights to visits during vacations. And during the visits that did occur, K. T. at times returned to Tubbs hungry and with soiled diapers. Tubbs confronted Cousin about these deficiencies in September 2013 (when K. T. was 22 months old), after which she did not hear from Cousin until December 2015 (when K. T. was 4 years old). At that point, Tubbs and Cousin jointly agreed that—given the 27-month visitation

---

[1] *Saravia v. Mendoza*, 303 Ga. App. 758, 758-59 (695 SE2d 47) (2010); *see Gibson v. Gibson*, 301 Ga. 622, 624 (801 SE2d 40) (2017) ("In reviewing a bench trial, [an appellate court] view[s] the evidence in the light most favorable to the trial court's rulings, defer[s] to the trial court's credibility judgments, and will not set aside the trial court's factual findings unless they are clearly erroneous.").

hiatus—they would begin reestablishing Cousin's relationship with K. T. by conducting visits supervised by Tubbs. Those visits began in January 2016 and occurred sporadically for several months. Beginning in June 2016, communication between the parties began to break down, with Cousin's last visit with K. T. occurring on July 9, 2016. After the parties were unable to agree on a proposed visit in August 2016, it appears that Cousin did not seek visitation with K. T. again until he filed his answer and counterclaim in the current action in May 2017.

Tubbs initiated this action by filing a petition to modify child support in March 2017. Cousin raised several counterclaims, seeking, in relevant part, (1) to have Tubbs held in contempt of the visitation provisions in the June 2013 Parenting Plan; and (2) joint legal and physical custody of K. T. Tubbs later orally sought to have Cousin held in contempt for failing to pay child support and insurance premiums for K. T.

Following a hearing, the trial court issued a "Final Order" in July 2018, in which it (1) granted Cousin's request to modify custody by awarding joint legal and physical custody to the parties, with primary physical custody to Tubbs; (2) denied Cousin's motion for contempt; (3) granted Tubbs's request to have Cousin held in contempt for failing to provide health insurance for K. T., but denied the request as

3

it pertained to past-due child-support obligations, which Cousin had since satisfied; and (4) granted Tubbs's request to modify child support by raising Cousin's obligation to $11,439 monthly, based on a gross monthly income of over $60,000 (*i.e.*, total income of $762,602.13 in 2017). Cousin filed a motion for a new trial, which the trial court denied. This appeal follows.

On appellate review of a bench trial, we will not set aside the trial court's factual findings unless they are clearly erroneous, and we properly give "due deference to the opportunity of the trial court to judge the credibility of the witnesses."[2] But the trial court's application of the law to the facts is reviewed *de novo*.[3] With these guiding principles in mind, we turn to Cousin's specific claims of error.

---

[2] *Autrey v. Autrey*, 288 Ga. 283, 284-85 (2) (702 SE2d 878) (2010) (punctuation omitted); *accord Marlowe v. Marlowe*, 297 Ga. 116, 119 (2) (772 SE2d 647) (2015); *Patel v. Patel*, 285 Ga. 391, 391 (1) (a) (677 SE2d 114) (2009); *see Carden v. Warren*, 269 Ga. App. 275, 276 (1) (a) (603 SE2d 769) (2004) (observing that, on appeal from a bench trial, the trial court's factual findings will not be disturbed "unless they are clearly erroneous or wholly unsupported by the evidence" (punctuation omitted)).

[3] *Dep't of Human Res. v. Woodruff*, 234 Ga. App. 513, 513 (507 SE2d 249) (1998).

1. Cousin argues that the trial court erred by declining to hold Tubbs in contempt after, he claims, she unilaterally imposed conditions on his visitation rights. We disagree.

To hold a party in contempt, a trial court must find that the party willfully disobeyed a court order.[4] In ruling on a contempt motion, a trial court is vested with wide discretion in deciding both "whether [the court's] orders have been violated and how such infringements should be treated," and we will not disturb the court's determinations on these issues absent an abuse of that discretion.[5] Indeed, given the wide latitude afforded to the trial court, we will affirm a contempt ruling "if there is any evidence in the record to support it."[6] Suffice it to say, as the fact-finder, it is the

---

[4] *See Higdon v. Higdon*, 321 Ga. App. 260, 263 (1) (c) (739 SE2d 498) (2013); *see also Saravia*, 303 Ga. App. at 763 (2) ("The essence of civil contempt is willful disobedience of a prior court order." (punctuation omitted)).

[5] *Friday v. Friday*, 294 Ga. 687, 691 (2) (755 SE2d 707) (2014); *see Park-Poaps v. Poaps*, 351 Ga. App. 856, 859 (1) (833 SE2d 554) (2019) ("The trial court's discretion in contempt matters is broad . . . ." (punctuation omitted)); *Dingle v. Carter*, 350 Ga. App. 255, 256 (1) (829 SE2d 604) (2019) ("The question of whether a contempt has occurred is for the trial court, and its determination will be overturned only if there has been a gross abuse of discretion." (punctuation omitted)).

[6] *Froehlich v. Froehlich*, 297 Ga. 551, 554 (3) (775 SE2d 534) (2015) (punctuation omitted); *accord Horn v. Shepherd*, 292 Ga. 14, 17 (4) (732 SE2d 427) (2012); *see Park-Poaps*, 351 Ga. App. at 859 (1) ("The trial court's discretion in contempt matters is broad, and its decision will be upheld if there is any evidence to

5

trial court's duty to "reconcile seemingly conflicting evidence and to weigh the credibility of witnesses."[7]

Here, construed in favor of the trial court's ruling,[8] the evidence shows that the parties mutually agreed to deviate from the Parenting Plan. In particular, the parties agreed that—given Cousin's two-year absence from the child's life—his initial visits with K. T. would be supervised, and once he established consistency with supervised visits, the parties would then transition to unsupervised visits. Although Tubbs testified that the determination as to consistency was hers to make (and that no overnight visits had yet occurred on that basis), she also noted that the parties jointly agreed to follow this course of action, rather than to follow the Parenting Plan. Importantly, Tubbs denied that she outright forbade all overnight visits. In that vein, the record indicates that Cousin's work schedule prevented full weekend visits with K. T. for at least part of the relevant time frame. Moreover, Tubbs did not object to

---

support it." (punctuation omitted)).

[7] *Higdon*, 321 Ga. App. at 267 (5) (punctuation omitted); *see Saravia*, 303 Ga. App. at 763 (2) (explaining that "it was for the trial court to determine credibility" in ruling on a contempt motion).

[8] *See Park-Poaps*, 351 Ga. App. at 859 (1); note 1, *supra*.

6

Cousin establishing a relationship with K. T. and agreed to abide by the Parenting Plan going forward.

The testimony above established that Tubbs did not outright prevent Cousin from visiting their child. Rather, viewed in favor of the trial court's ruling, the evidence shows that the parties jointly agreed that—given Cousin's 27-month absence from the child's life—Tubbs would temporarily exercise some control over the visits. Under these circumstances, which included Cousin's long absences, he has not met his burden of establishing that the trial court abused its broad discretion when it found that Tubbs had not interfered with his visitation rights to an extent that rose to the level of willful contempt of the Parenting Plan.[9] We therefore affirm the trial court's ruling in this regard.[10]

_____

[9] *See Saravia*, 303 Ga. App. at 763 (2) (holding that the trial court did not abuse its discretion in denying the appellant's contempt motion where, to the extent that there was a conflict in the testimony, "[t]he trial court apparently chose to credit the testimony of [the appellee]," which supported the conclusion that any violation of the custody provisions of the parties' divorce decree was not willful). Cousin's claim regarding a second contempt motion that he filed in 2019 is not properly before this Court, as the current record contains no indication that the trial court has ruled on that motion. *See 9766, LLC v. Dwarf House, Inc.*, 331 Ga. App. 287, 291 (4) (b) (771 SE2d 1) (2015) ("This court is for the correction of errors, and where the trial court has not ruled on an issue, we will not address it." (punctuation omitted)).

[10] We also decline to address Cousin's conclusory assertions that Tubbs "willfully prevented him from exercising" his parenting time "*on multiple occasions*"

2. Cousin contends that the trial court also erred by adjudicating Tubbs's motion for contempt absent sufficient prior notice to him and by finding him in contempt for failing to provide insurance coverage for K. T. Once again, we disagree.

Under OCGA § 9-11-15 (b),[11]

> [w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after

---

and "willfully *refused to allow . . . parenting time*," given his failure to identify any record evidence supporting these broad claims, which, in any event, conflict at least in part with the evidence credited by the trial court. (Emphasis supplied.) *See* Court of Appeals Rule 25 (c) (2) (i) ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of a specific reference, the Court will not search for and may not consider that enumeration"); *Ellison v. Burger King Corp.*, 294 Ga. App. 814, 815 (1) (670 SE2d 469) (2008) ("[W]e decline to look in the record for matters which should have been set forth in the brief."); *Dickerson v. State*, 280 Ga. App. 29, 34 (2) (633 SE2d 367) (2006) ("[I]t is not the appellate court's duty to cull the record in search of error."); *see also Tolbert v. Toole*, 296 Ga. 357, 363 (3) (767 SE2d 24) (2014) ("It is [the appellant]'s burden, as the party challenging the ruling below, to affirmatively show error from the record on appeal."); *Brittain v. State*, 329 Ga. App. 689, 704 (4) (a) (766 SE2d 106) (2014) ("[M]ere conclusory statements are not the type of meaningful argument contemplated by our rules." (punctuation omitted)); *Higdon*, 321 Ga. App. at 267 (5) (observing that resolving conflicts in the evidence is the province of the trial court).

[11] Unless otherwise noted, all statutes cited in this opinion refer to the versions in effect when the final hearing in this case occurred in May and June 2018.

8

judgment; but failure so to amend does not affect the result of the trial of these issues.

This statute applies if the new issue was "actually litigated with the express or implied consent of both parties."[12] Thus, no matter how erroneous a ruling of a trial court might be, a litigant "cannot submit to a ruling or acquiesce in the holding, and then complain of the same on appeal. He must stand his ground. Acquiescence deprives him of the right to complain further."[13] A corollary to this rule is the proposition that "one cannot complain of a judgment, order, or ruling that his own procedure or conduct procured or aided in causing."[14] Whether an issue has been tried

---

[12] *Sedehi v. Chamberlin*, 344 Ga. App. 512, 522 (1) (811 SE2d 24) (2018).

[13] *Appling v. Tatum*, 295 Ga. App. 78, 83 (4) (670 SE2d 795) (2008) (punctuation omitted).

[14] *Saravia*, 303 Ga. App. at 762 (1) (punctuation omitted); *see Sadler v. Rigsby*, 343 Ga. App. 269, 271-72 (1) (a) (808 SE2d 11) (2017) (observing that a party cannot complain on appeal "of a result he aided in causing, because induced error is not an appropriate basis for claiming prejudice" (punctuation omitted)); *Mullins-Leholm v. Evans*, 322 Ga. App. 869, 872 (3) (746 SE2d 628) (2013) (holding that the appellant waived any objection to the trial court's authority to modify her visitation rights in the context of a contempt proceeding by acquiescing in the court's decision to address the issue).

with the parties' implied consent, then, is a question of fact, and "a decision on this question is generally considered to be within the sound discretion of the trial court."[15]

During the hearing in this case, Tubbs orally asserted a claim for contempt against Cousin on grounds that, *inter alia*, he had stopped paying child support and insurance premiums. Specifically, Tubbs testified in May 2018 that (1) Cousin last made a child-support payment in early February 2018; (2) he stopped providing medical insurance for K. T. several years prior; and (3) she paid $11,902.82 to keep K. T. insured since Cousin stopped paying for his insurance. The trial court denied the contempt motion as to child support, because Cousin had by then caught up with his support payments. But the court granted the motion as to the failure to provide medical insurance for K. T., ordering Cousin to pay $11,902.82 to Tubbs to purge himself of the contempt.

In his appellate brief, Cousin identifies no instances in the record in which he objected either to inadequate notice of Tubbs's contempt motion or to the introduction of evidence supporting her request.[16] Consequently, Cousin has not met

---

[15] *Sedehi*, 344 Ga. App. at 523 (1) (punctuation omitted).

[16] *See Tolbert*, 296 Ga. at 363 (3) (explaining that it is the appellant's burden "to affirmatively show error from the record on appeal"). Although Cousin objected to the *adequacy* of some of Tubbs's evidence as to the amount she expended for

his burden of showing that the trial court abused its discretion in inferring his consent, and having "acquiesced to the trial court's decision" to address Tubbs's contempt motion, he "cannot complain of this decision on appeal."[17]

_____

K. T.'s medical insurance, Cousin has not identified any instances in the record in which he objected to consideration of the issue. *See generally* note 10, *supra*.

[17] *See Saravia*, 303 Ga. App. at 762 (1) (rejecting the appellant's claim that the trial court erred when, during a hearing on his motion for contempt, it also considered the appellee's petition for a change of custody, reasoning that the appellant acquiesced in that procedure by failing to object to it); *Davis v. Phoebe Putney Health Sys., Inc.*, 280 Ga. App. 505, 506-07 (1) (634 SE2d 452) (2006) (holding that the appellants waived their claim that the trial court improperly considered an oral motion to dismiss when they acquiesced in the court's procedure by arguing the merits of the motion during the hearing at which the motion was made and failing to object to consideration of the motion until after the hearing had concluded); *compare Sedehi*, 344 Ga. App. at 523 (1) (holding that the trial court erred in awarding alimony where the record did not show that the appellee "ever explicitly requested an alimony award, that the parties litigated that issue, or that anyone other than the trial court squarely recognized it as an issue in the case" (punctuation omitted)).

The decisions cited by Cousin in support of his passing, conclusory assertion that the absence of prior notice renders the contempt ruling a "nonamendable defect" are inapposite, as they involved parties who had no opportunity to be heard on the claims at issue because they failed to appear at the hearings due to lack of notice. *See Coker v. Coker*, 251 Ga. 542, 542-43 (307 SE2d 921) (1983) (addressing the denial of a motion to set aside where the appellant claimed, in relevant part, that he had not received notice of the final hearing in a divorce action); *Brown v. C & S Nat'l Bank*, 245 Ga. 515, 517-19 (265 SE2d 791) (1980) (holding that the trial court properly granted a motion to set aside a garnishment judgment because the face of the record showed the absence of notice of the hearing). The final case cited by Cousin on this issue, *Hamrick v. City of Calhoun*, 243 Ga. 716, 716-18 (256 SE2d 599) (1979)—in which the Supreme Court held that a city ordinance requirement regarding notice to

11

As to the substance of the contempt ruling, Cousin contends that he presented "robust unrefuted evidence" that he made a "good faith attempt to provide medical coverage" for K. T., but lacked the child's social-security number, which the insurer required, and which Tubbs refused to provide. In that regard, Cousin testified that—when he began a new job in 2014 or 2015—he "provided Ms. Tubb[s]'s information to the insurance provider." According to Cousin, the provider contacted Tubbs, but received no response. Cousin also testified that, in 2017, he sought to add K. T. to a new insurance policy and that the new provider similarly tried to contact Tubbs, also to no avail. Cousin claimed that he was unable to add K. T. to his policy at that time because he did not have the child's social-security number. Cousin acknowledged that he never asked Tubbs directly for the information, and when asked why, he responded, "Because there was always some smart remark in regards to giving me any information about it."

_____

city employees of their dismissals was waivable, as a result of which inadequate notice did not constitute a nonamendable defect—has no obvious bearing here.

12

Tubbs testified that, to the best of her knowledge, Cousin had K. T.'s social-security number because he previously insured the child. She was also unaware of any subsequent attempts to contact her to obtain that information, and Cousin never asked her about it when they saw each other in person.

In its final order, the trial court stated that it was "not persuaded by" the reasons provided by Cousin for failing to keep K. T. insured. Consequently, the court either disbelieved Cousin's claims or found that he made insufficient efforts to obtain the information needed to comply with his obligations under the Parenting Plan. Either way, in light of the testimony discussed *supra*, the court's factual finding in this regard is not clearly erroneous and therefore will not be disturbed on appeal.[18]

3. In several related enumerations of error, Cousin challenges various aspects of the trial court's rulings underlying its child-support calculations. We address each of these arguments in turn.

(a) Cousin claims that the trial court improperly attributed to him a total income of $762,602.13 in 2017, arguing that the court (1) improperly based that figure on

---

[18] *See Froehlich*, 297 Ga. at 554 (3) (observing that a trial court's contempt ruling will be affirmed if there is any evidence to support it); *Higdon*, 321 Ga. App. at 267 (5) (explaining that it is the trial court's duty to resolve conflicts in the evidence).

only two years in which his income was much higher than normal and failed to consider more recent financial information that he provided; (2) erroneously included in that figure irregular gambling winnings from two years; (3) failed to account for his itemized deductions; and (4) failed to deduct one-half of his self-employment and Medicare taxes. Cousin has not met his burden of showing that the trial court erred on these issues.

This Court reviews a trial court's ruling on a child-support modification petition for an abuse of discretion, and we will uphold the court's factual findings if they are supported by any evidence.[19] Thus, we will set aside the trial court's factual findings only if they are clearly erroneous, and we defer to the court's credibility judgments[20] but review its application of the law to the facts *de novo*.[21] With these guiding principles in mind, we turn to Cousin's claims regarding the calculation of his income.

---

[19] *Gowins v. Gary*, 288 Ga. App. 409, 410 (654 SE2d 162) (2007).

[20] *See* note 2, *supra*, and accompanying text.

[21] *See* note 3, *supra*.

(i) We first address Cousin's challenge to the trial court's decision to calculate his 2017 income based on his 2015 and 2016 tax returns.

In Georgia, determining each parent's monthly gross income is "the first step that a court must take in calculating child support under [our] child support guidelines."[22] These guidelines broadly define gross income as "all income from any source . . . , whether earned or unearned,"[23] including, *inter alia*, income from self-employment, prizes, and lottery winnings.[24] Income from self-employment includes income generated by an LLC in which one holds an ownership interest.[25]

---

[22] *Appling*, 295 Ga. App. at 80 (2).

[23] OCGA § 19-6-15 (f) (1) (A); *see* note 11, *supra*. Although this statute was amended multiple times after the final hearing in this case, see Ga. L. 2019, pp. 636-47, §§ 1-9; Ga. L. 2019, pp. 711, 715, 718, §§ 5, 15; Ga. L. 2018, pp. 937-43, §§ 1-1 through 1-5 & 3-1, none of the amendments changed any of the provisions at issue in this appeal.

[24] OCGA § 19-6-15 (f) (1) (A) (iii), (xix), (xx).

[25] *See* OCGA § 19-6-15 (f) (1) (B) (providing that self-employment income includes "income from . . . business operations," such as "proprietorship of a business, or joint ownership of a partnership[ or] limited liability company").

15

Cousin's 2014 federal tax return indicates that his gross income for the year—$64,334 in wages plus $70,790 in income from an LLC —was $135,124. His 2015 federal tax return reported $106,000 in wages, $128,472 in LLC income, $295 in business income, and $731,250 in gambling winnings, for a gross income of $966,017.[26] That same year, he claimed $731,250 in gambling losses, which, with other deductions, resulted in federal taxable income of $219,984. Cousin's 2016 federal tax return reported $106,000 in wages, $186,509 in LLC income, $941,200 in gambling winnings, and no business income, for a gross income of $1,233,709.[27]

---

[26] As discussed *infra*, the trial court relied on lower 2015 income amounts in calculating Cousin's 2017 income. *See* note 28, *infra*, and accompanying text. For the reasons discussed in note 33, *infra*, any potential error in this regard is harmless on the facts of this case.

[27] Cousin's 2016 tax return also reported business losses of $6,140, which resulted in an adjusted gross income of $1,227,569. Cousin does not enumerate as error the trial court's failure to include these losses in its income calculations, and we therefore express no opinion on this issue, which we deem waived. See *Gresham v. Harris*, 349 Ga. App. 134, 138 (1) n. 10 (825 SE2d 516) (2019) (concluding that the appellant waived any claim that the trial court erred in making a certain finding "by failing to enumerate it as an error and provide any supporting argument" on appeal); *In the Interest of I. H. H.*, 345 Ga. App. 808, 811 (815 SE2d 133) (2018) (holding that a mother appealing the termination of her parental rights waived on appeal any challenge as to the juvenile court's determination that she abandoned her child, by failing to enumerate as error and challenge that finding on appeal); *Karlsberg v. Hoover*, 142 Ga. App. 590, 594 (236 SE2d 520) (1977) ("[T]his court has held that an appellant is required in its initial brief to file an argument which supports any enumerations of error it does not wish to waive."). But even if Cousin had not waived

16

That year, he also claimed $941,200 in gambling losses, which, with other deductions, resulted in federal taxable income of $277,134.

As of June 1, 2018 (the last of three hearing dates), Cousin had not yet filed a 2017 tax return. His 2017 Form W-2 lists $106,879.13 in wages. The latest pay stub he provided for 2018 shows total wages through May 11, 2018, of $41,192.97. Cousin also provided a Domestic Relations Financial Affidavit ("DRFA"), dated May 22, 2018, in which he claimed gross monthly income of $24,375.74 and net monthly income (gross income less state and federal taxes and FICA) of $16,292.24.

The trial court found that Cousin's representations in his DRFA damaged his credibility in several ways. For example, Cousin's DRFA reflects a monthly mortgage payment of $4,700, whereas a May 2017 mortgage statement shows a monthly payment of only $2,232.41, and Cousin testified at the hearing that he paid $2,500 monthly toward his mortgage. Cousin also failed to include any gambling income in the DRFA, which the court found further diminished his credibility. Notably, Cousin's DRFA also did not list any LLC income, which further diminished its probative value.

---

this claim, any potential error in this regard would be harmless for the reasons discussed in note 33, *infra*.

Ultimately, the trial court found that Cousin provided "complete financial information" only for 2015 and 2016. Consequently, the court calculated Cousin's 2017 income by averaging his 2015 and 2016 LLC and "other" income and adding that amount ($655,723)[28] to his 2017 W-2 wages ($106,879.13), to arrive at a yearly income of $762,602.13 and monthly gross income of $63,550.18.

Importantly, bank statements in the record indicate that Cousin's LLC continued to do business throughout 2017, although he included no such income on his DRFA. And Cousin has not identified record evidence establishing that he had no gambling income between the end of 2016 and the hearing dates in this case.[29]

---

[28] For reasons that are not immediately apparent on the current record, the trial court appears to have relied on a 2016 summary of Cousin's 2015 income prepared by his accountant, which indicates that he received only $55,445 in gambling winnings (denoted as "other income" in the summary), rather than on his actual 2015 tax return, which lists $731,250 in gambling winnings. The trial court also appears not to have included Cousin's business income of $295 in its calculation. As a result, the court calculated Cousin's 2015 gross income to be $289,917. For the reasons discussed in note 33, *infra*, any potential errors in these respects are harmless on the facts of this case.

[29] In his appellate brief, Cousin asserts that the trial court "heard unrefuted testimony" that he "had not received such income from gambling winnings in any year" before 2015 or after 2016. He similarly maintains that the court "heard unrefuted testimony" that he "did not make that amount of gambling income in 2017 or 2018." But Cousin does not provide any record citations supporting these assertions, and we decline to search the record on his behalf. *See* note 10, *supra*.

Consequently, given the substantial LLC and gambling income listed on Cousin's 2015 and 2016 tax returns, the trial court was entitled to discount Cousin's credibility as to his more recent income, to find that his 2017 W-2 and DRFA provided incomplete information regarding his gross income in 2017, and to calculate his 2017 income based on his prior two years of income.[30] We therefore affirm the trial court's ruling in this regard.

(ii) Cousin also argues that, by including his gambling winnings from two years in calculating his income, the trial court improperly applied OCGA § 19-6-15 (f) (1) (D), which provides, in relevant part,

> When income is received on an irregular, nonrecurring, or one-time basis, the court or the jury may, but is not required to, average or prorate the income over a reasonable specified period of time or require the parent to pay as a one-time support amount a percentage of his or her nonrecurring income, taking into consideration the percentage of recurring income of that parent.

---

[30] *See Appling*, 295 Ga. App. at 81-82 (3) (holding that the trial court was entitled to attribute to the appellant total income substantially higher than he claimed, in light of the court's factual findings as to his credibility, earning capacity, and substantial assets); *Carden*, 269 Ga. App. at 276 (1) (a) (noting that a trial court's factual findings will be affirmed unless they are "clearly erroneous or wholly unsupported by the evidence" (punctuation omitted)).

19

According to Cousin, the two-year period on which the trial court based its calculation is not a "reasonable specified period of time" under the statute. On a related note, Cousin contends that the court's calculation impermissibly assumes that he will continue to receive similar gambling income in the future. But setting aside whether Cousin sufficiently preserved this issue for appellate review during the hearing on his motion for a new trial,[31] his arguments are misplaced in several respects.

To begin with, by its very terms, the statutory provision on which Cousin relies is permissive, rather than mandatory. As a result, what constitutes a "reasonable specified period of time" necessarily is a factual finding that is relegated to the trial court's discretion, taking into account the totality of the circumstances of each case.[32]

---

[31] *See Employees Ret. Sys. of Ga. v. Baughman*, 241 Ga. 339, 341 (3) (245 SE2d 282) (1978) (explaining that a claim abandoned before the trial court presents nothing for this Court to review); *Carden*, 269 Ga. App. at 278 (3) ("On appeal, this Court does not review issues which were not raised and ruled on below." (punctuation omitted)); *T. C. Prop. Mgmt., Inc. v. Tsai*, 267 Ga. App. 740, 741 (600 SE2d 770) (2004) (holding that the appellants' failure to raise a claim before the trial court by objection or in a motion for a new trial waived appellate review).

[32] *See generally, e.g., McDonald v. Garden Servs., Inc.*, 163 Ga. App. 851, 852-53 (295 SE2d 551) (1982) (reviewing for abuse of discretion the trial court's finding as to the reasonableness of the appellant's delay in paying costs and holding that, absent such abuse, this Court will not substitute its judgment for the trial court's, even if individual members of this Court may have reached a different conclusion).

And given the trial court's findings that Cousin provided incomplete financial information for 2017 and that his current financial disclosures lacked credibility, we will not second-guess the court's decision to take into account the only two years for which Cousin had disclosed gambling winnings in calculating his 2017 income.[33]

In this regard, Cousin's reliance on *Dodson v. Walraven*[34] is misplaced for several reasons. First, the discussion in *Dodson* on which Cousin relies involved a

[33] *See Appling*, 295 Ga. App. at 81-82 (3) (holding that the trial court did not abuse its discretion in attributing income to the appellant in light of the court's factual findings and credibility determinations); *McDonald*, 163 Ga. App. at 853 (noting that this Court will not substitute its judgment on issues that are within the trial court's discretion absent a manifest abuse of that discretion). Although Cousin takes issue with the trial court's failure to include his 2014 income when it calculated his average LLC and gambling income, he fails to acknowledge that the court inexplicably omitted $675,805 in 2015 gambling winnings in making its calculations. Instead, the court included only $55,445 in such winnings, rather than the amount of $731,250 that was listed on Cousin's 2015 federal tax return. See note 28, *supra*. Had the trial court included the proper amount for 2015 in its 2017 income calculation and also included Cousin's 2014 income in that calculation, the result would have been LLC income of $128,590.33 (($70,790 + $186,509 + $128,472) ÷ 3) and gambling income of $557,483.33 (($941,200 + $731,250) ÷ 3). And when added to Cousin's 2017 wages of $106,879.13, those amounts would have resulted in total 2017 income of $792,952.79—more than $30,000 higher than the current calculation. Consequently, on the facts of this case, any possible error in failing to include 2014 income in the court's 2017 calculation is harmless, as is the court's use of a lower number for 2015 gambling income. *See Tarleton v. Griffin Fed. Sav. Bank*, 202 Ga. App. 454, 455 (2) (b) (415 SE2d 4) (1992) ("An appellant must show harm as well as error to prevail on appeal; error to be reversible must be harmful.").

[34] 318 Ga. App. 586 (734 SE2d 428) (2012).

distinct statutory provision (not at issue here), governing "'[g]ifts that consist of cash or other liquid instruments, or which can be converted to cash.'"[35] Second, in *Dodson*, we concluded that the trial court erred when it attributed to the appellant "a monthly lump-sum gift income of $3,000" based on sporadic gifts from his parents—which included a vehicle, meals, temporary free housing in his parents' home, and occasional assistance with living expenses—because there was no evidence as to the "actual amount" of any such ongoing payments.[36] But here, the record includes specific, six-figure gambling winnings earned over the course of two consecutive years, followed by financial disclosures by Cousin that the trial court found were both incomplete and lacking in credibility. Simply put, the context here is vastly different than the facts at issue in *Dodson*.[37] Thus, we affirm the trial court's ruling on this issue as well.

---

[35] *Id.* at 588 (1) (quoting OCGA § 19-6-15 (f) (1) (A) (xviii)). At the time of the decision in *Dodson*, this provision was codified at OCGA § 19-6-15 (f) (1) (A) (xvii).

[36] *Id.* at 588-89 (1).

[37] A later discussion in *Dodson*, on which Cousin does not rely, addressed the application of OCGA § 19-6-15 (f) (1) (D) to attorney fees paid on the appellant's behalf in the context of an award of back child support, and thus also involved a scenario not present here. *See* 318 Ga. App. at 590 (2).

(iii) Cousin also maintains that the trial court erred by failing to account for the itemized deductions reflected on his 2016 tax return, which included $941,200 as gambling losses.[38] Yet again, we disagree.

Cousin's claim implicates the construction of the Georgia child-support statutes, which we review *de novo*.[39] In so doing, we must presume that "the General Assembly meant what it said and said what it meant."[40] Thus, absent clear evidence that a contrary meaning was evinced by the legislature (as reflected in the relevant statutory text), "we assign words in a statute their ordinary, logical, and common meanings."[41]

---

[38] *See* 26 USC § 165 (d) (2016) (permitting an itemized deduction to be taken on one's federal income tax return for "[l]osses from wagering transactions . . . only to the extent of the gains from such transactions"). Cousin does not take issue with the trial court's failure to account for his 2015 itemized deductions, presumably because the court failed to include all of his 2015 gambling winnings in its calculations. *See* note 28, *supra*.

[39] *Jackson v. Sanders*, 299 Ga. 332, 334 (788 SE2d 387) (2016).

[40] *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (punctuation omitted).

[41] *Turner v. Ga. River Network*, 297 Ga. 306, 308 (773 SE2d 706) (2015) (punctuation omitted).

As discussed *supra*, calculation of child support begins with a determination of each parent's "gross income," which is broadly defined as "all income from any source," including prizes and lottery winnings.[42] The statute identifies several specified items that are "[e]xcluded from gross income," none of which implicate gambling winnings or losses.[43] Importantly, each parent's gross income is then adjusted by deducting the following enumerated expenses, if any apply:

---

[42] OCGA § 19-6-15 (b) (1), (f) (1) (A) (xix), (xx); *see Appling*, 295 Ga. App. at 80 (2) (explaining that the first step in calculating child support is determining each parent's gross income).

[43] OCGA § 19-6-15 (f) (2) (A)-(E). The excluded items are:

(A) Child support payments received by either parent for the benefit of a child of another relationship;

(B) Benefits received from [certain enumerated] means-tested public assistance programs . . . ;

(C) Foster care payments paid by the Department of Human Services or a licensed child-placing agency for providing foster care to a foster child in the custody of the Department of Human Services;

(D) A nonparent custodian's gross income; and

(E) Benefits received under Title IV-B and IV-E of the federal Social Security Act and state funding associated therewith for adoption assistance.

(A) One-half of the amount of self-employment taxes;

(B) Preexisting orders; and

(C) Theoretical child support order for qualified children, if allowed by the court."[44]

Notably missing from this list are gambling losses and federal itemized deductions. And when, as here, "the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly."[45] Thus, in light of the foregoing statutory language, the trial court did not err in failing to exclude Cousin's itemized deductions, and we affirm its ruling in this regard as well.

(iv) Cousin also contends that the trial court erred by failing to deduct one-half of his self-employment and Medicare taxes when calculating his gross income. But because the record contains no indication that Cousin raised this issue before the trial

---

[44] OCGA § 19-6-15 (b) (2).

[45] *State v. Hammonds*, 325 Ga. App. 815, 817 (755 SE2d 214) (2014) (punctuation omitted).

court, either during the merits hearing or in his motion for a new trial, we deem it waived.[46]

(v) Cousin maintains that the trial court erred by failing to account for several other children he supports in calculating his income. Once again, we disagree.

The child-support guidelines permit a court to adjust a parent's gross income by crediting the parent for support provided to children of that parent living in that parent's home under the rubric of a "[t]heoretical child support order for qualified children."[47] A "qualified child" for purposes of this provision is defined as any child:

---

[46] *See Employees Ret. Sys. of Ga.*, 241 Ga. at 341 (3) (observing that a claim abandoned before the trial court presents nothing for this Court to review); *9766, LLC*, 331 Ga. App. at 291 (4) (b) ("This court is for the correction of errors, and where the trial court has not ruled on an issue, we will not address it." (punctuation omitted)); *T. C. Prop. Mgmt., Inc.*, 267 Ga. App. at 741 (holding that the failure to raise a claim by objection or in a motion for a new trial waived appellate review).

[47] OCGA § 19-6-15 (b) (2) (C); *see* OCGA § 19-6-15 (f) (5) (C) (providing that "credits for either parent's other qualified child living in the parent's home for whom the parent owes a legal duty of support may be considered by the court for the purpose of reducing the parent's gross income"); *Neal v. Hibbard*, 296 Ga. 882, 888 (6) (770 SE2d 600) (2015) (explaining that "an adjustment for theoretical child support orders . . . allows a trial court to take into account the costs of maintaining a child living in a parent's home, other than a child who is the subject of the child support order that the court is considering" (punctuation omitted)).

26

(A) For whom the parent is legally responsible and in whose home the child resides;

(B) That the parent is actually supporting;

(C) Who is not subject to a preexisting [child-support] order; and

(D) Who is not before the court to set, modify, or enforce support in the case immediately under consideration.[48]

A court may consider a "theoretical child support" adjustment if the failure to do so "would cause substantial hardship to the parent."[49] Ultimately, whether to apply a theoretical child support order is "in the trial court's discretion, and is based upon consideration of the best interest of the child for whom child support is being awarded."[50]

Here, the trial court explicitly recognized that it was within its discretion to consider a "theoretical child support" adjustment, but declined to apply such an adjustment, concluding that this would be in the best interest of K. T. because it will

---

[48] OCGA § 19-6-15 (a) (20); *see* OCGA § 19-6-15 (a) (18) (defining "preexisting order" as an order requiring child-support payments).

[49] OCGA § 19-6-15 (f) (5) (C).

[50] *Neal*, 296 Ga. at 888 (6) (punctuation omitted).

"better ensure a standard of living that [K. T.] could expect" if he and his parents lived together. The court also found that failing to apply the adjustment will not cause a substantial hardship to Cousin in light of his "considerable" income.

Cousin argues that this ruling essentially ignores his obligations to his five other children, is "punitive," "imposes a substantial financial hardship" on him, is not in the best interest of K. T., and awards K. T. "more financial support than [Cousin's] other five . . . children combined." But Cousin does not cite any legal authority or identify any record evidence supporting these conclusory assertions or his implicit claim that the trial court committed reversible error in this regard. He therefore has not met his burden on appeal, and we affirm the trial court's ruling on this issue.[51]

(b) Finally, Cousin challenges the trial court's imposition of a high-income upward deviation of $9,352 monthly to his child-support obligation, which raised his total monthly obligation for K. T. to $11,439. Specifically, he contends that no evidence supports the magnitude of this deviation, which he characterizes as "arbitrary" and "egregious" and which, he claims, is intended to punish him for

---

[51] *See Brittain*, 329 Ga. App. at 704 (4) (a) ("[A]n appellant must support enumerations of error with argument and citation of authority, and mere conclusory statements are not the type of meaningful argument contemplated by our rules." (punctuation and footnote omitted)); *see also* note 10, *supra*.

28

spending large sums on gambling. For the reasons that follow, we agree that a deviation of the magnitude imposed here cannot stand.

The child-support guidelines provide that—for parents with a combined adjusted income of up to $30,000 per month and only one child—the presumptive amount of child support is $2,236 per month (total for both parents).[52] When the parents' monthly income exceeds $30,000, "the court . . . may consider upward deviation to attain an appropriate award of child support for high-income parents which is consistent with the best interest of the child."[53] If a court decides that a deviation from the presumptive child-support amount is warranted, it must make certain written findings of fact as set forth in OCGA § 19-6-15 (c) (2) (E).[54]

---

[52] OCGA § 19-6-15 (o). The trial court found that Cousin and Tubbs had adjusted monthly incomes of $62,556.18 and $4,047.81, respectively.

[53] OCGA § 19-6-15 (i) (2) (A).

[54] *Fladger v. Fladger*, 296 Ga. 145, 147-49 (2) (765 SE2d 354) (2014); *Jackson v. Sanders*, 333 Ga. App. 544, 556-57 (4) (773 SE2d 835) (2015).

Ultimately, whether special circumstances make the presumptive amount of child support "excessive or inadequate and whether deviating from the presumptive amount serves the best interest of the child . . . are committed to the discretion of the court."[55] Further,

> [i]n the absence of any mathematical formula, fact-finders are given a wide latitude in fixing the amount of alimony and child support, and to this end they are to use their experience as enlightened persons in judging the amount *necessary for support* under the evidence as disclosed by the record and all the facts and circumstances of the case.[56]

Here, the trial court calculated the parties' joint basic child-support obligation as $2,236 monthly.[57] After considering the parties' pro rata share of combined

---

[55] *Spurlock v. Dep't of Human Res.*, 286 Ga. 512, 516 (3) (690 SE2d 378) (2010) (punctuation omitted); *see Parker v. Parker*, 293 Ga. 300, 304 (2) (745 SE2d 605) (2013) (observing that "qualitative determinations regarding deviation from the presumptive amount of child support are committed to the discretion of the court or jury" (punctuation omitted)); *see also Black v. Black*, 292 Ga. 691, 697 (4) (a) (740 SE2d 613) (2013) (explaining that an appellate court "review[s] the decision to deviate, or not to deviate, from the presumptive amount of child support under the abuse of discretion standard" (punctuation omitted)); *Hamlin v. Ramey*, 291 Ga. App. 222, 225 (1) (661 SE2d 593) (2008) (same).

[56] *Bloomfield v. Bloomfield*, 282 Ga. 108, 111 (3) (a) (646 SE2d 207) (2007) (emphasis supplied) (punctuation omitted).

[57] *See* OCGA § 19-6-15 (o) (setting a joint basic child-support obligation of $2,236 monthly for parents with a combined adjusted income of $30,000 or more per

income[58] and applying various adjustments, the court calculated Cousin's presumptive monthly child-support obligation to be $2,087.05. The court then concluded that a high-income deviation is in K. T.'s best interest in light of Cousin's high income and the disparity in the parties' incomes. The court highlighted that evidence had been presented that Cousin lived a "very privileged lifestyle," regularly made bank withdrawals of $10,000 at a casino, owned multiple parcels of real estate and at least four vehicles, and used business funds to pay "many large personal expenses." The court further found that the goal of approximating the standard of living that K. T. would enjoy in an intact household also rendered the presumptive child-support amount unjust or inappropriate, particularly when viewed in context with the "enormous" sums of money Cousin has spent on gambling in recent years.

In determining a suitable deviation amount, the trial court sought guidance from former statutory provisions that identified a range of 17 to 23 percent of gross income as appropriate for the support of a single child.[59] Ultimately, the court

---

month).

[58] The court found that Cousin and Tubbs earned 93.92 percent and 6.08 percent of their combined income, respectively. *See* note 52, *supra*.

[59] *See* OCGA § 19-6-15 (b) (5) (2004) (providing that "[t]he amount of the obligor's child-support obligation shall be determined by multiplying the obligor's

determined that an upward deviation of $9,352 monthly—for a total monthly obligation of $11,439 monthly, or 18 percent of Cousin's monthly gross income of $63,550.18—was in the best interest of K. T. As discussed below, the trial court abused its discretion in doing so.

The trial court calculated the parties' combined gross monthly income to be $67,597.99, which is 225 percent of the highest monthly income provided for in the child-support guidelines ($30,000).[60] The monthly child-support obligation the court imposed on Cousin, however, is 548 percent of his presumptive child-support obligation ($2,087.05)—nearly double the percentage by which the parents' income exceeds the guidelines. Notably, in a child-support worksheet Tubbs submitted in May 2018, she proposed an upward deviation of $1,000 monthly (based on an estimated monthly income for Cousin of $52,125.13) and a total monthly obligation of $3,780. The $9,352 deviation imposed by the trial court is 935 percent of the deviation proposed by Tubbs, and the $11,439 total monthly obligation is 303 percent of the total obligation proposed by Tubbs.

gross income per pay period by a percentage based on the number of children for whom child support is being determined" and identifying the applicable percentage for one child as 17 to 23 percent).

[60] *See* OCGA § 19-6-15 (o).

The parties have not identified, and research has not revealed, an appellate decision in this State involving a high-income deviation that even approaches the magnitude of the deviation here, much less one in which such a deviation was affirmed on appeal.[61] Moreover, the trial court erroneously gave what appears to be largely—if not entirely—dispositive weight to the prior (and since-repealed) child-support guidelines, which identified a range of 17 to 23 percent of the obligor's gross income as appropriate for the support of a single child.[62] The current guidelines,

---

[61] *See Fladger*, 296 Ga. at 145-49 (1) & (2) (addressing a high-income deviation of $2,000 (based on an average monthly income of $54,732) above a presumptive obligation of $3,051.83, which resulted in a total obligation that was 166 percent of the presumptive obligation, which the Supreme Court reversed and remanded due to the trial court's failure to make all of the necessary written findings supporting the deviation); *Spurlock*, 286 Ga. at 516-17 (3) (reversing and remanding —also for failure to make the statutorily required findings—a high-income deviation of $274.30 above a presumptive obligation of $725.44, which resulted in a total obligation of 138 percent of the presumptive obligation); *Jackson*, 333 Ga. App. at 546, 550, 556-58 (4) & n. 37 (addressing a high-income deviation of $1,100 (based on an average monthly income of $31,666.66) above a presumptive obligation of $2,894 (adjusted for other, non-income deviations), which resulted in a total obligation that also was 138 percent of the obligation without the high-income deviation, which this Court likewise reversed and remanded due to the absence of all required findings).

[62] *See* OCGA § 19-6-15 (b) (5) (2004); *see also Hamlin*, 291 Ga. App. at 223 (1) (explaining that, while the prior version of the child-support guidelines calculated child support based on the non-custodial parent's income, the current version of the guidelines employs a "model . . . designed to have the child support divided between the parties on a pro rata basis" (punctuation omitted)). Rather than calculating the

33

however, employ a regressive sliding scale to the presumptive child-support obligation in OCGA § 19-6-15 (o). Thus, for one child, the presumptive obligation for a monthly combined adjusted income of $800 is $197, which is 24.6 percent of the parents' monthly combined adjusted income, whereas the presumptive obligation for a monthly combined adjusted income of $30,000 is $2,236, which is 7.5 percent of the monthly combined adjusted income.[63] By relying so heavily on the prior version of the guidelines, the trial court essentially ignored the General Assembly's most recent pronouncements on this issue. To that end, even assuming that a presumptive obligation of 7.5 percent of the parents' monthly combined adjusted income continues to apply to incomes above $30,000,[64] that would result in a presumptive joint obligation here of $4,995.30 (7.5 percent of the parties' monthly combined adjusted income of $66,603.99 ), and an obligation for Cousin of $4,678.59

---

combined basic child-support obligation of both parents, as is done under the current guidelines, the prior guidelines calculated the obligor's obligation as a percentage of his or her gross income. *Compare* OCGA § 19-6-15 (o) (2018), *with* OCGA § 19-6-15 (b) (1)-(2), (5) (2004). Notably, the prior guidelines explicitly recognized that "[a] party's other support obligations to another household" may render the presumptive obligation "excessive or inadequate." OCGA § 19-6-15 (c) (6) (2004).

[63] OCGA § 19-6-15 (o).

[64] The regressive nature of the current guidelines suggests otherwise.

34

(taking into account the adjustments included in the parties' child-support worksheet).[65] The monthly obligation that the trial court imposed on Cousin—$11,439—is 244 percent of that amount. Similarly, the multiplier used by the trial court to calculate Cousin's obligation—18 percent of his income—is 240 percent of the 7.5 percent multiplier currently employed by the General Assembly for high-income parents.

Finally, in its order, the trial court made multiple references to the fact that Cousin paid only $217 monthly for K. T.'s child support during years that he had six-figure gambling winnings and expenses. In one such reference, in a sentence immediately preceding its decision to impose a high-income deviation, the court specifically opined that the sums expended on gambling would better have been spent on child support for K. T. The face of the trial court's order thus indicates that the magnitude of the deviation it imposed is premised at least in part on an attempt to

---

[65] In making these adjustments, the trial court (1) multiplied the joint basic child-support obligation of $2,236 by Cousin's pro-rata share of combined income of 93.92 percent ($2,100.05), (2) added $200.81 to that number as an adjustment for work-related child-care and health-insurance expenses ($2,300.86), and (3) subtracted from that number $213.81 as an adjustment for additional expenses paid ($2,087.05).

35

compensate K. T. for the relatively low payments Cousin made in the past. A trial court cannot, however, retroactively modify child support in a modification proceeding.[66] And a trial court may not implicitly do that which it cannot do explicitly.[67] Thus, the amount of the deviation awarded here cannot stand insofar as

[66] *See Ga. Dep't of Human Res. v. Prater*, 278 Ga. App. 900, 902 (2) (630 SE2d 145) (2006) ("[A]n order modifying child support may operate only prospectively." (punctuation omitted)); *see also* OCGA § 19-6-17 (e) (3) ("Any payment or installment of support under any child support order is, on and after the date due . . . [n]ot subject to retroactive modification.").

[67] *See State v. Darby*, 284 Ga. 271, 274 (3) (663 SE2d 160) (2008) ("It is a general rule that one cannot do indirectly that which the law does not allow to be done directly." (punctuation omitted)); *Dep't of Human Res. v. Lewis*, 217 Ga. App. 399, 399-400 (457 SE2d 824) (1995) (holding that the superior court erred when it considered an untimely appeal from an agency decision over which it lacked jurisdiction, under the guise of "a reconsideration of its decision to adopt the agency decision," because doing so would permit a party "to do indirectly that which the law does not allow to be done directly"); *Cotton v. Bank South, N.A.*, 212 Ga. App. 1, 5 (3) (b) (440 SE2d 704) (1994) (reversing a declaratory judgment that had the effect of enforcing a settlement agreement that had become null and void when the federal court in which the agreement arose lost jurisdiction over the proceeding because "[t]o enforce [the] settlement agreement in state court would allow [a party] to do indirectly that which the law would not allow to be done directly"); *Eschen v. Roney*, 127 Ga. App. 719, 720-21 (194 SE2d 589) (1972) (holding that a defendant in a tort action could not maintain a third-party claim for contribution against the minor plaintiff's mother, which would indirectly violate the doctrine of parental immunity).

it is premised, in part, on an attempt to compensate K. T. for foregone child support predating the current proceeding. The deviation in this case, then, appears to have a primary punitive purpose, and, even if that was not the driving force behind the trial court's decision, the result is, nevertheless, punitive in effect for all of the reasons highlighted above.

In sum, the trial court abused its discretion in awarding a high-income deviation of the magnitude it imposed here. And given our holding in this regard, we express no opinion on whether the factual findings on which the trial court based its deviation—which Cousin does not challenge—may be sufficient to impose a lower deviation. That said, the nature and extent of factual findings required to support a deviation necessarily must bear some relation to the magnitude of the deviation.[68]

---

[68] *See generally Fladger*, 296 Ga. at 149 (2) (explaining that written findings in support of a high-income deviation "must connect the dots to explain" the reasons underlying the deviation, including, *inter alia*, "*how* the application of the presumptive child support amount would be unjust or inappropriate considering the relative ability of each parent to provide support and *how* the best interest of the children is served by the deviation"). In that regard, there necessarily must be a point in each case where a higher deviation will no longer be in the child's best interest because, for example, it has a punitive or financially disabling effect on the obligor, thereby impairing the obligor's ability to comply with the obligation and, as a result, the parent-child relationship. While written findings in this regard are not explicitly required by the child-support guidelines, their relevance nevertheless is dictated by logic and the circumstances of each case.

For all these reasons, we vacate the high-income deviation imposed by the trial court, affirm the trial court's judgment in all other respects, and remand this case for further proceedings consistent with this opinion.

*Judgment affirmed in part and vacated in part, and case remanded. Gobeil and Hodges, JJ., concur.*